ACCEPTED
14-15-00568-CV
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
7/6/2015 4:58:50 PM
CHRISTOPHER PRINE
CLERK

## NO. _____

**In the Court of Appeals
for the \_\_\_ District of Texas
Houston, Texas**

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS

7/6/2015 4:58:50 PM

~~CHRISTOPHER A. PRINE~~
CHRISTOPHER A. PRINE
Clerk

**JINSUN LLC**

**Relator**

ORIGINAL MANDAMUS PROCEEDING
FROM THE 113TH JUDICIAL TRIAL COURT OF HARRIS COUNTY, TEXAS

TRIAL COURT CAUSE NO. 2012-54501

## PETITION FOR WRIT OF MANDAMUS - RECORD

Respectfully submitted,

/s/ Jason M. Hopkins
Mary-Olga Lovett
  State Bar No: 00789289
  lovettm@gtlaw.com
Jason S. Lewis
  State Bar No: 24007551
  lewisjs@gtlaw.com
Jason M. Hopkins
  State Bar No: 24059969
  hopkinsjm@gtlaw.com
**GREENBERG TRAURIG LLP**
1000 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 374-3555
Facsimile: (713) 374-3505

Dated: July 6, 2015          ORAL ARGUMENT REQUESTED

# MANDAMUS RECORD

| TAB | DOCUMENT | DATE |
|---|---|---|
| A. | Plaintiff's Original Petition | 09/18/2012 |
| B. | Plaintiff's Nineteenth Amended Petition | 05/22/2015 |
| C. | Plaintiff's Motion to Quash Deposition of Wayne Dolcefino and Motion for Protective Order | 06/19/2015 |
| D. | Jinsun's Response to Motion to Quash Dolcefino Deposition | 06/24/2015 |
| E. | Jinsun's Supplemental Response to Motion to Quash Dolcefino Deposition | 06/27/2015 |
| F. | June 16, 2015 email serving Jinsun's First Amended Deposition Subpoena Duces Tecum | 06/16/2015 |
| G. | Order quashing Dolcefino deposition | 06/30/2015 |

# TAB A

2012-54501 / Court: 113

Filed 12 September 18 P3:26
Chris Daniel - District Clerk
Harris County
ED101J017084361
By: Charleta Johnson

CAUSE NO. _____

| | | |
|---|---|---|
| KHALED ALATTAR, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| | § | |
| KEVAN CASEY, FREDERICK | § | |
| HUTTNER, ANSLOW & JACLIN, | § | |
| LLP, AMIR MIRESKANDARI, | § | |
| TOP GEAR, INC. n/k/a | § | |
| LUXEYARD, INC., JONATHAN | § | |
| FRIEDLANDER, and SCOTT GANN, | § | |
| | § | |
| Defendants. | § | _____ JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION

Plaintiff, Khaled Alattar, files this Original Petition against Defendants, Kevan Casey, Frederick Huttner, Anslow & Jaclin, LLP, Amir Mireskandari, Top Gear, Inc. n/k/a Luxeyard, Inc., Jonathan Friedlander, and Scott Gann, and would show as follows:

### DISCOVERY CONTROL PLAN

1.      Plaintiff intends for discovery to be conducted under Level 2 of Rule 190 of the Texas Rules of Civil Procedure.

### PARTIES

2.      Plaintiff Khaled Alattar ("Alattar") is an individual residing in Sugar Land, Fort Bend County, Texas.

3.      Defendant Kevan Casey ("Casey") is an individual residing in Harris County, Texas and may be served with process at 3 W. Broad Oaks Drive, Houston, Texas 77056.

Certified Document Number: 53387863 - Page 1 of 25

4. Defendant Frederick Huttner ("Huttner") is an individual residing in Harris County, Texas and may be served with process at 675 Bering Drive, Suite 250A, Houston, Texas 77056.

5. Defendant Anslow & Jaclin, LLP ("A&J") is a New Jersey limited liability partnership and may be served with process at 195 US Highway 9, Suite 204, Englishtown, New Jersey 07726 by serving the Texas Secretary of State.

6. Defendant Amir Mireskandari ("Mireskandari") is an individual residing in Harris County, Texas and may be served with process at 4550 Post Oak Place, Suite 210, Houston, Texas 77027.

7. Defendant Top Gear, Inc. n/k/a Luxeyard, Inc. ("Top Gear") is a Delaware corporation doing business in the State of Texas and may be served with process at Delaware Business Incorporators, Inc., 3422 Old Capitol Trail, Suite 700, Wilmington, Delaware 19808 by serving the Texas Secretary of State. Top Gear is now known as Luxeyard, Inc. and its stock trades under the symbol LUXR.[1]

8. Defendant Jonathan Friedlander ("Friedlander") is an individual residing in Las Vegas, Nevada and may be served with process at 5438 Vegas Drive, #761, Las Vegas, Nevada 89108 by serving the Texas Secretary of State.

9. Defendant Scott Gann ("Gann") is an individual residing in Dallas, Texas and may be served with process at 5220 Spring Valley, Suite 195, Dallas, Texas 75254.

## JURISDICTION AND VENUE

10. Jurisdiction and venue are proper in Harris County, Texas because Defendants Kevan Casey, Frederick Huttner, and Amir Mireskandari are residents of

---

[1] Top Gear changed its name to Luxeyard, Inc. on January 9, 2012. The company name is branded as "LuxeYard."

2

Harris County, Texas, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Harris County, Texas. Further, Plaintiff seeks recovery in excess of the minimum jurisdictional limits of this Court. Additionally, Top Gear has had sufficient contacts with the State of Texas and has purposefully availed itself of the laws of this State. To subject Top Gear to jurisdiction in Texas would not offend traditional notions of fair play and justice. The causes of action against Top Gear arise out of Top Gear's contacts with this State. A&J has had sufficient contacts with the State of Texas and has purposefully availed itself of the laws of this State. To subject A&J to jurisdiction in Texas would not offend traditional notions of fair play and justice. The causes of action against A&J arise out of A&J's contacts with this State. Friedlander has had sufficient contacts with the State of Texas and has purposefully availed himself of the laws of this State. To subject Friedlander to jurisdiction in Texas would not offend traditional notions of fair play and justice. The causes of action against Friedlander arise out of Friedlander's contacts with this State

## SUMMARY

11.     This is a suit for fraud and related claims arising out of an illegal "pump and dump" stock scheme.[2] Defendants' carefully-orchestrated plan involved a conspiracy to fraudulently acquire the stock of a small publicly traded company, then artificially inflate – or "pump" – the price of its shares through aggressive advertising, only to then rapidly sell – or "dump" – the stock at the inflated price. While such crimes are unfortunately quite prevalent, what makes this particular scheme unusual is that the underlying company was a legitimate business. The fraud in this instance was not so

---

[2] http://www.sec.gov/answers/pumpdump.htm

3

much on an unsuspecting public as on the company's co-founders – Alattar and Mireskandari – whose business was essentially hijacked by Defendants.

12. The success of Defendants' pump and dump scheme is illustrated by the chart below, showing the track record of this "penny stock" during the relevant time period:



13. The dramatic rise – and later fall – of the stock price as shown in the above chart resulted in an approximately $30,000,000.00 windfall in just 60 days. Defendants, and other unnamed co-conspirators, reaped a huge benefit at Alattar's expense, whose own stock was restricted and thus could not be sold. Alattar seeks actual damages and disgorgement of profits to prevent Defendants' unjust enrichment.

## FACTUAL BACKGROUND

14. LuxeYard is an online purveyor of luxury goods that follows the "flash sale" retail model used by Ruelala.com, Gilt.com, OneKingsLane.com and others.[3] Alattar conceived of the idea for LuxeYard in December 2010 and pitched it to a

---

[3] http://www.luxeyard.com/living/about

Certified Document Number: 53387863 - Page 4 of 25

business associate – Mireskandari – with whom Alattar shared office space. Impressed with the concept, Mireskandari partnered 50/50 with Alattar to form LY Retail LLC ("LY") to develop Alattar's idea. The purpose of the company was simple: to own and operate an e-commerce website through which LY could sell luxury home goods using the "flash sale" retail model. Alattar was responsible for acquiring the domain, branding, website development, incorporation, and developing a detailed business plan. Mireskandari was responsible for lining up future product suppliers and generating industry buzz for their new venture. The domain www.luxeyard.com became active in May 2011.

15. In August 2011, as Alattar's idea went from concept to reality, Alattar and Mireskandari agreed that LY needed additional capital to become fully operational and for future growth. To accomplish this goal, Mireskandari approached Huttner, allegedly Mireskandari's financial advisor, on behalf of Alattar and LY for assistance in raising new capital. Huttner put Mireskandari in touch with Casey, who he represented was a knowledgeable and reputable businessman with experience in raising capital. Unknown to Alattar and Mireskandari, Huttner and Casey were previously involved in other pump and dump schemes, but failed to disclose this material fact. It did not take long for Huttner and Casey, and presumably others acting in concert with them, Friedlander and Gann, to see the potential to scam Alattar and Mireskandari. By the end of August 2011, Casey and Huttner sketched out a detailed plan – undisclosed to Alattar and Mireskandari – to pump and dump future LY stock.

16. Casey and Huttner outlined what sounded like a simple, honest mechanism by which LY could obtain the financing it needed by going public. The plan, as explained to Alattar and Mireskandari, was to turn LY into a publicly traded company

5

through a reverse merger.[4] A reverse merger is an SEC-authorized means of taking a private company public in a relatively short period of time and with substantially less hassle than an initial public offering. A reverse merger occurs when a private operating company wishing to go public is acquired by a non-operating, public "shell" corporation. Typically, the owners of the private operating company exchange their ownership interest in the private company (in this case, LY) for the outstanding shares of the public company (in this case, Top Gear). After the "merger," the public company changes its name to that of the previously private company and begins operating as such, precisely what occurred in this case.

17. In this case, the proposed shell company was a Delaware corporation named Top Gear. Huttner and Casey represented to Alattar and Mireskandari that reverse merging with Top Gear would provide funding for LY, allow LY to increase operations and grow its business, and access capital markets.

18. Additionally, Mireskandari and Alattar produced their business plan to the Casey team in August 2011, and although the Casey team provided comments thereto, the Casey team never mentioned that the entire plan was impossible in light of the looming pump and dump known only to the Casey team. On the contrary, the Casey team said they were agreeable to funding the proposed plan – not one that recognized a short-lived company used for purposes of a pump and dump scheme.

19. Casey and Huttner characterized the end game as one in which Top Gear would, in the future, become a premier web-based group-buying retailer of luxury products at deep discounts to retail prices. To accomplish this goal, they represented that Top Gear would initially acquire a strong subscriber base, and thereafter, attract

---

[4] http://www.sec.gov/investor/alerts/reversemergers.pdf

6

recognizable merchants. Huttner and Casey said that the initial plan was to offer household goods and related items, and then, over time, Top Gear would expand its offerings to include a broad scope of products. Through their meetings with Alattar and Mireskandari, not to mention written material, Huttner and Casey distinguished steps that Top Gear would take in the first twelve months, from those that would be taken in the following years, and likewise, from those that would be taken many years down the road. These representations, made by Casey, Huttner and A&J, were completely false and made with the intent to induce Alattar and Mireskandari into executing the reverse merger transaction. Casey, Huttner, and A&J's actual intent was to use LY and Top Gear to perpetrate a quick pump and dump scheme with the help of Friedlander and Gann. Had Alattar known Casey and Huttner's actual intent was to dump their shares a few months later, he would not have sold his interest in LY to Top Gear.

20. The specifics of the events leading up to the reverse merger are as follows. After several conference calls and emails, on or about August 28, 2011, Casey and Huttner proposed the following terms to Mireskandari and Alattar:

    a.    LY would have a "pre-money" valuation of $1,500,000;

    b.    Casey and his affiliates would invest the following:

        (i)    $500,000 into LY directly, and

        (ii)    $1,000,000 for acquisition of a shell company and for a market awareness program;

    c.    After the investment, the book value of the company *would be* $3,000,000.00;

    d.    Mireskandari and Alattar would receive 20,000,000 shares; and

    e.    Casey, Huttner and their affiliates would receive 20,000,000

7

shares.[5]

21.     Alattar received a term sheet relating to the proposed deal on September 7, 2011. LY and Casey's company, Far East Strategies LLC, (Casey's company) executed the term sheet on September 18, 2011, providing:

| | |
|---|---|
| Issue Price - | $0.20 per share of common stock based upon 40,000,000 shares outstanding or 6.25% of the total shares of the company post reverse merger; |
| Lock-Up Agreement - | Officers and *insiders* agree to *lock-up* their shares for *18 months* after the closing date; |
| Incentive Shares - | The Company is permitted to issue ... and all incentive shares must have a *four (4) year* vesting period; |
| Shell Equity - | Consummation of the reverse merger with a public shell.... The shell will be provided by Far East Strategies, LLC; and |
| Anti-Dilution Rights - | If at any time in the *12 months* following closing...; and |
| Warrants - | [ ] Warrants A and B ... shall have a term of *5 years*.... |

22.     Casey referred Alattar, Mireskandari and LY to the law firm of A&J, who they subsequently hired to consummate the transaction. Unbeknownst to Alattar and Mireskandari, their attorneys were not only fully aware of Casey and Huttner's actual intentions, but intended to assist them in their scheme to defraud Alattar and Mireskandari. In a brazen act of fiduciary malfeasance, A&J papered *all* sides of the transaction – the pre-merger acquisition of Top Gear by Casey, Huttner, Freidlander, Gann, and their affiliates, the distribution of Top Gear shares, the reverse merger, the shareholder agreements, and all of the pre- and post-merger SEC filings – all while

---

[5] The shares were later increased by agreement to 30,000,000 and 30,000,000, respectively.

8

Certified Document Number: 53387863 - Page 8 of 25

never disclosing to Alattar and Mireskandari that Casey, Huttner, Friedlander and Gann, and their affiliates intended to defraud them.

23.     The reverse merger was executed on November 8, 2011. Unbeknownst to Alattar, Mireskandari and LY, A&J was simultaneously representing Huttner and Casey in connection with their plans to use Top Gear to perpetrate the pump and dump scheme.[6]  In fact, A&J represented Huttner and Casey in their acquisition of Top Gear on November 7, 2011; that is, the *day before* Top Gear acquired LY in the reverse merger.  In other words, Casey, Huttner, Friedlander and Gann, and their affiliates, had already obtained all of the ostensibly unrestricted, or free trading, stock in the shell company that was supposed to be merged with LY.  Thus, Casey and his team controlled Top Gear prior to the November 8, 2011 agreement whereby Top Gear:

a.     entered into a Contribution and Assumption Agreement wherein Top Gear transferred its assets and liabilities to an entity referred to in shorthand as "SpinCo";

b.     entered into an Agreement of Sale with the prior owners of Top Gear to retire 7,000,000 restricted shares of Top Gear; and

c.     acquired all of LY in exchange for 1,785,294 new shares of Top Gear.

24.     The resulting arrangement materially differed from the one represented to Alattar and Mireskandari in the following ways, among others:

a.     Casey never provided the $500,000 in working capital to LY;

---

[6] A&J was the same law firm that formed Huttner's company, Huttner 1999 Partnership, Ltd. and Casey's companies, Jinsun, LLC and Acadia Holding Corporation. A&J prepared the quarterly and annual filings for Top Gear and therefore, had actual knowledge of the beneficial owners of each share of Top Gear, but A&J failed to disclose the identity of these beneficial owners who are hiding behind corporate formalities. A&J never told LY or Alattar that although Alattar was subject to a lock-up agreement, Casey and his affiliates were not. Moreover, by concealing the names of the beneficial shareholders in the SEC filings, A&J violated federal and state law. Thus, the co-conspirators were allowed to dump their shares in Top Gear at the very same time they were promoting the company.

Certified Document Number: 53387863 - Page 9 of 25

Certified Document Number: 53387863 - Page 10 of 25

b.  Casey, Huttner, Friedlander and Gann, as insiders, did not lock-up their shares in Top Gear as agreed;

c.  instead of making Top Gear buy 100% of the reverse merged LY, Casey and his team conspired to do a private placement of LY into Top Gear;

d.  Casey and his team traded their shares (restricted by law) through their affiliates; and

e.  promoted LUXR stock, not for the purpose of raising new capital for LuxeYard so that it could become a viable entity for many years to come, but to secretly enrich themselves within a few months at Alattar's and Mireskandari's expense.

25.  Not long after Top Gear changed its name and stock symbol, Casey and Huttner, with the help of Friedlander, financed and executed an aggressive marketing campaign designed to artificially inflate the price of LUXR stock. In that effort, they were very successful. Shortly thereafter, Huttner, Casey, Friedlander, Gann, and their affiliates, dumped a large volume of supposedly unrestricted shares — shares that should have been restricted. As expected, following a massive sell-off, the stock price plummeted to $.10. Instead of aiding LY in many years of continued growth by going public and raising operating capital as they had represented to Alattar and Mireskandari, Casey and Huttner — and their co-conspirators – pocketed enormous profits through the pump and dump scheme, and left Alattar and his legitimate business venture at the bottom of a death spiral from which it may never recover. The co-conspirators included Friedlander and Gann. From Alattar's perspective, the entire purpose of the transaction was completely frustrated. From Defendants' perspective, it was a huge success, albeit at Alattar's expense. Put simply, had Alattar known of Defendants' true intentions, he would *never* have agreed to sell his interest in LY, which would instead have pursued a legitimate business transaction.

10

26. In June 2012, Mireskandari uncovered the pump and dump scheme and allegedly "confronted" Huttner and Casey. In complete contravention of his fiduciary obligations to LuxeYard and Alattar, Mireskandari attempted to settle his and LuxeYard's claims against Casey and Huttner for his own personal benefit and with no regard whatsoever for LuxeYard's business or its shareholders. Instead of acting swiftly to protect LuxeYard and Alattar and prevent further loss, Mireskandari attempted to enrich himself at LuxeYard and Alattar's expense.

27. A formal fiduciary relationship existed between Mireskandari and Alattar because where, as here, a closely held LLC has one managing member and one passive member, the LLC operates as a limited partnership. The managing member owes a fiduciary duty to the passive member, just as a general partner owes a fiduciary duty to a limited partner. Additionally, an informal fiduciary relationship existed because of Mireskandari and Alattar's personal and business relationship and the nature of their joint enterprise. Mireskandari exercised dominant control over LY and its operations, and Alattar relied on Mireskandari for moral, financial, and personal support and guidance with respect to LY's business affairs. Alattar, only in his 20's, looked to and received substantial business advice from the elder, and presumably more accomplished, Mireskandari, especially in connection with their joint venture. Thus, Alattar justifiably relied on and expected Mireskandari to act in his best interest when conducting business on behalf of LY. This relationship existed prior to Top Gear's acquisition of LY.

28. Mireskandari defrauded Alattar by conning Alattar into relinquishing millions of LUXR shares, even as both of them were being defrauded by Casey and Huttner and their affiliates. As a result of this fraud, Alattar transferred approximately

11

10 million LUXR shares to Mireskandari based on misrepresentations made by Mireskandari that the shares would be used to raise additional capital for LuxeYard. Mireskandari further misrepresented to Alattar that Alattar had an obligation to raise money to retain his shares, which was not true. Additionally, Mireskandari misrepresented the amount of money he invested individually in LY/Top Gear in order to induce Alattar to give LUXR shares to Mireskandari.

## CAUSES OF ACTION

### Common Law Fraud against Casey, Huttner, Top Gear, and Mireskandari

29. Casey and Huttner, individually and on behalf of Top Gear, committed fraud by making material misrepresentations to Alattar leading up to the reverse merger transaction between Top Gear and LY, which they knew to be false or asserted recklessly without knowledge of their falsity. At the time these representations were made, Casey and Huttner and their affiliates owned a controlling interest in Top Gear. The false material representations made to Alattar included the following:

   a. the Top Gear-LY reverse merger would be for the purpose of raising capital for LY, allowing LY to increase operations and grow the business for years to come, and further allowing LY access to capital markets (and potentially more funding) in the future;

   b. Casey and Huttner would provide $500,000 in working capital to LuxeYard upon completion of the reverse merger;

   c. Casey and Huttner would provide $500,000 for the acquisition of a public shell;

   d. Casey and Huttner would provide $500,000 to raise market awareness of LuxeYard's business so LuxeYard could raise capital; and

   e. upon completion of the reverse merger, all shares held by officers and insiders would be "locked-up," i.e., unable to be sold, for 18 months after the closing date.

12

Certified Document Number: 53387863 - Page 12 of 25

None of these statements were true. Indeed, Casey and Huttner always (and secretly) intended to dump their shares in LuxeYard within a matter of months.

30. These representations were made through the term sheet provided to Alattar as well as several conference calls and emails to Alattar directly, or to Mireskandari with the intent that the information be relayed to Alattar. These representations were material in that a reasonable person would attach importance to and be induced to act on the information in determining whether to enter into the reverse merger transaction. These representations were false in the following ways: (1) the true purpose of the reverse merger was not for the benefit of LY, but for the purpose of perpetrating a quick pump and dump scheme for the benefit of Casey, Huttner and their affiliates; (2) Casey and Huttner did not provide the working capital as represented; (3) any money invested by Casey and Huttner for marketing was not used for the legitimate purpose of promoting the new company, but was instead used to artificially inflate LUXR stock so it could be quickly sold in a massive illegal share dump; and (4) Huttner, Casey and their affiliates – clearly "insiders" within the meaning of the term sheet – did not lock-up their shares, but instead sold them in huge blocks that severely damaged LUXR's share price and reputation.

31. Additionally, Mireskandari and Alattar produced their business plan to the Casey team in August 2011, and although the Casey team provided comments thereto, the Casey team never mentioned that the entire plan was impossible in light of the looming pump and dump known only to the Casey team. On the contrary, the Casey team said they were agreeable to funding the proposed plan – not one that recognized a short-lived company used for purposes of a pump and dump scheme.

Certified Document Number: 53387863 - Page 13 of 25

32. These Defendants' actions immediately following the reverse merger and the subsequent success of the pump and dump scheme make it clear that the misrepresentations were made to Alattar with knowledge of their falsity. Casey and Huttner made the misrepresentations to Alattar with the intent that they be acted upon. Specifically, the misrepresentations were made with the intent that Alattar would be induced into executing the reverse merger. Alattar relied upon these misrepresentations in agreeing to the reverse merger and would not have entered into that transaction had he known the true intent of Casey and Huttner. Alattar has been injured as a result of this fraud, and seeks disgorgement of all ill-gotten profits obtained by these Defendants as a result of the fraud. In addition, Alattar seeks actual damages.

33. Casey and Huttner committed fraud by making false material representations to Alattar in connection with certain stock purchase agreements, whereby Alattar was induced into transferring his shares of Top Gear to Casey and Huttner after that merger. Casey and Huttner represented to Alattar that Alattar had an obligation to raise money for LuxeYard, and because of his alleged failure to do so he must give up his shares to them. Casey and Huttner represented that they would use the shares Alattar gave up to raise additional capital. In fact, Casey and Huttner distributed these shares to their affiliates or kept them for own benefit in furtherance of the pump and dump scheme. These representations were false when made and were intended to induce Alattar to give up valuable shares for little to no consideration. Alattar relied on these representations and would not have transferred his shares had he known that Casey and Huttner intended to use the shares for their own benefit instead of the benefit of the company. Alattar would not have relinquished these shares had he known that he

14

had no obligation to raise capital. Alattar has been injured as a result and seeks damages equal to the value of the shares he lost as a result of the fraud.

34. Mireskandari committed fraud by making material misrepresentations to Alattar leading up to the reverse merger transaction between Top Gear and LY, which he knew to be false or asserted recklessly without knowledge of its falsity. Specifically, Mireskandari represented to Alattar that all shares held by officers and insiders after the closing of the reverse merger would be "locked-up," i.e. unable to be sold, for 18 months after the date of closing. This representation was made by Mireskandari to Alattar several times in emails, phone calls, and in-person discussions. This representation was false in that Mireskandari, despite his status as an officer and insider, *never* locked-up his shares for 18 months, but rather entered into a much more favorable agreement whereby he could start selling blocks of shares after only 9 months. Mireskandari made this representation to Alattar with no intention of entering into an 18-month lock-up agreement, and intended Alattar to rely on this representation in entering into the reverse merger transaction and his own lock-up. Alattar relied on Mireskandari's promise to lock-up his shares for 18 months in making his decision to execute the reverse merger and would not have participated in the transaction had he known the truth. Alattar has been injured as a result of this fraud. Alattar seeks damages equal to the 50% ownership interest in the enterprise that he gave up in consideration for the reverse merger transaction.

35. Mireskandari further committed fraud by making false material representations, both individually and on behalf of LuxeYard as its executive, in connection with certain stock purchase agreements, whereby Alattar was induced into transferring more than half of his LUXR shares. Mireskandari represented to Alattar

15

that Alattar had an obligation to raise money for LuxeYard, and because of his failure to do so he must transfer his shares to Mireskandari. Mireskandari represented that he would use the shares Alattar gave up to raise additional capital. In fact, Mireskandari kept the shares for himself and still holds them. These representations were false when made and were intended to induce Alattar to relinquish valuable shares for little to no consideration. Alattar relied on these representations and would not have transferred his shares had he known that Mireskandari intended to keep the shares for his own benefit. Alattar has been injured as a result, and seeks damages equal to the value of the shares he transferred to Mireskandari.

### *Fraud by Nondisclosure against Casey, Huttner, Top Gear, and Mireskandari*

36. Casey and Huttner, individually and on behalf of Top Gear, committed fraud by nondisclosure in connection with the reverse merger transaction by failing to disclose new material information when that material information made earlier representations misleading or untrue. In this case, Casey and Huttner made material representations to Alattar as described above. Those representations became misleading and untrue before the reverse merger took place because Casey and Huttner knew that they would not be involved in LuxeYard for more than a few months, much less many years, they knew they would not be subjecting themselves to any lock-up agreements as they had previously agreed, and they knew that the stated purpose of the reverse merger was actually to perpetrate a rapid pump and dump scheme. Casey and Huttner knew that Alattar was ignorant of the facts concerning the lock-up agreements and the quick pump and dump scheme and did not have an equal opportunity to discover the truth. Moreover, Defendants were deliberately silent and failed to disclose

16

these facts with the intent to induce Alattar to enter into the reverse merger transaction and continually build a viable company for years to come. In this regard, Alattar acted in reliance on the omission or concealment and suffered injury as a result of acting without knowledge of the undisclosed facts. Alattar seeks disgorgement of all ill-gotten profits resulting from the fraud by nondisclosure as well as actual damages.

37. Mireskandari committed fraud by nondisclosure in connection with the reverse merger transaction by failing to disclose new material information when that material information made earlier representations misleading or untrue. In this case, Mireskandari made material representations to Alattar as described above. Those representations became misleading and untrue before the reverse merger took place because Mireskandari knew that he would not be subjecting himself to any lock-up agreement as he had previously agreed. Mireskandari knew that Alattar was ignorant of the facts concerning the lock-up agreements and did not have an equal opportunity to discover the truth. Moreover, Mireskandari was deliberately silent and failed to disclose these facts with the intent to induce Alattar to enter into the reverse merger transaction. In this regard, Alattar acted in reliance on the omission or concealment and suffered injury as a result of acting without knowledge of the undisclosed facts. Alattar seeks disgorgement of profits and his actual damages.

### Statutory Fraud against Casey, Huttner, Top Gear, and Mireskandari

38. Casey and Huttner, individually and on behalf of Top Gear, committed statutory fraud in violation of Texas Business & Commerce Code Section 27.01 in connection with the reverse merger transaction and supposed plans to build a premier web-based seller of a broad scope of luxury items. Casey and Huttner knew all along LuxeYard would never reach the "broad scope" phase. Casey and Huttner made false

17

representations of fact as well as false promises to Alattar as described above. These false representations and promises were made for the purpose of inducing Alattar into entering into the reverse merger transaction. Alattar relied on these false representations and promises when he entered into the transaction, and this reliance caused him injury. Alattar seeks disgorgement of all ill-gotten profits received by Casey and Huttner as a result of this fraud, as well as actual damages.

39. In addition, the actions of Casey, Huttner, and Mireskandari in connection with the stock purchase agreements described above constitute statutory fraud in violation of Texas Business & Commerce Code Section 27.01. These defendants made misrepresentations of fact and false promises, outlined above, to Alattar for the purpose of inducing Alattar into transferring large blocks of LUXR shares for nominal consideration. Alattar relied on these false representations and promises when he agreed to relinquish his shares, and this reliance has caused him injury. Alattar seeks damages equal to the value of the shares he relinquished as a result of the fraud.

### *Breach of Fiduciary Duty against A&J and Mireskandari*

40. A&J had an attorney-client relationship with Alattar and LY. As Alattar's attorneys, A&J owed a fiduciary duty to Alattar. A&J breached its fiduciary duties by, among other things, (1) assisting Casey and Huttner's inducement of Alattar into not only the reverse merger transaction, but the agreement to work together to build a venture that would last for years to come for purposes of engineering the quick pump and dump scheme, (2) failing to disclose Casey and Huttner's scheme, (3) failing to disclose A&J's own role in the scam, (4) failing to take steps to prevent the fraud, (5) failing to disclose the fraud after it occurred, and (6) failing to disclose A&J's conflict of interest. A&J assisted Casey and Huttner in connection with their acquisition of the

18

controlling interest of Top Gear, and A&J prepared the contracts and other documents for the reverse merger transaction at Casey and Huttner's direction. These actions constitute a breach of their fiduciary duty to Alattar, and Alattar has suffered injury as a result. Alattar seeks forfeiture of all fees paid to A&J in connection with its representation of Alattar and LY, as well as actual damages.

41. Mireskandari owed a formal fiduciary duty to Alattar as the sole managing member of LY, a closely held LLC operating as a limited partnership. Mireskandari further owed Alattar an informal fiduciary relationship based on their personal and business relationship. Mireskandari exercised dominant control over the company and its operations, and Alattar relied on Mireskandari for moral, financial, and personal support and guidance with respect to LY's business affairs. Thus, Alattar justifiably relied on and expected Mireskandari to act in his best interest when conducting business on behalf of LY. These facts existed prior to Top Gear's acquisition of LY. Mireskandari breached his formal and informal fiduciary duties to Alattar by fraudulently inducing Alattar into executing the reverse merger transaction, inducing Alattar to relinquish a large portion of his LUXR stock, by signing a release and waiver on behalf of LuxeYard in exchange for cash consideration paid to Mireskandari personally, and by attempting to induce Alattar into releasing his claims related to the pump and dump scheme. These breaches have caused injury to Alattar and have resulted in a substantial benefit to Mireskandari. Thus, Mireskandari is liable to Alattar for actual damages and for disgorgement of all ill-gotten benefits.

### *Violation of the Texas Securities Act against Casey, Huttner, A&J, Friedlander and Gann*

42. As outlined above, Casey and Huttner offered or sold securities to Alattar

19

by means of an untrue statement of material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading. TEX. VERNON'S ANN. CIV. ST. ARTS. 581-1 et seq. Casey and Huttner violated the Texas Securities Act by misrepresenting and/or omitting the disclosure of material facts. Casey and Huttner are liable under the civil penalty provisions of the Texas Securities Act. TEX. REV. CIV. STAT. ANN. ART. 581-33. Casey and Huttner bought, sold, and issued securities using fraudulent means and communications in direct violation of the civil penalty provisions of the act, and these actions damaged Alattar by devaluing Alattar's company and shares. A&J, Freidlander and Gann are liable under the Act as far as aiders and abettors. As a result, Alattar seeks damages equal to the decreased value of all LUXR shares of which he is the beneficial owner.

### Conspiracy against Casey, Huttner, A&J, Friedlander and Gann

43. Casey, Huttner, A&J, Friedlander and Gann — and other unnamed co-conspirators — had a meeting of the minds to defraud Alattar and breach fiduciary duties owed to Alattar by using his legitimate business as a front to perpetrate an overnight pump and dump scheme. One or more unlawful overt acts were committed by each of these defendants, such as A&J's drafting of the fraudulent documents connected to the reverse merger transaction and A&J's assisting Casey and Huttner in acquiring the controlling interest of Top Gear prior to the reverse merger. These defendants conspired further to defraud Alattar into believing that the nature of the transaction at issue was to assist LY in achieving continued growth by going public through a reverse merger and then go on to become a premier web-based company without disclosing that Defendants' actual intent was to use the shell company to

20

perpetrate a pump and dump scheme. These defendants, acting jointly and in concert, each engaged in unlawful acts in furtherance of their conspiracy, all as outlined above. Alattar has been injured as a result of defendant's conspiracy and seeks his actual damages.

### *Aiding and Abetting against Casey, Huttner, A&J, Friedlander and Gann*

44. Defendants, individually and as a group, assisted or encouraged each other, assisted and participated with each other, and also acted in concert of action. Under Texas law, such group participation constitutes aiding and abetting and warrants the imposition of joint liability even if the plaintiff dealt primarily with a single defendant. Stated another way, when a defendant provides assistance or encouragement to another person who commits a tort, and the aiding or encouragement is a substantial factor in causing the tort, then the defendant is considered a tortfeasor, and consequently, is liable for the consequences of the tort. In this case, Casey, Huttner A&J, Friedlander and Gann, individually and collectively, aided and abetted each other and others unnamed in committing the torts enumerated above. Hence, joint and several liability is appropriate.

### *Unjust Enrichment against Casey, Huttner, Mireskandari, Freidlander and Gann*

45. Alattar seeks the equitable remedy of unjust enrichment against Casey, Huttner, Mireskandari, Friedlander and Gann. When a person obtains a benefit from another by fraud, duress, or the taking of undue advantage, the aggrieved party may sue to prevent unjust enrichment. To prevent unjust enrichment and to deter others from violating securities laws and fiduciary duties, a court has broad powers to order a defendant to disgorge all illicit gains and impose a judgment in trust on those gains.

21

Further, where two or more individuals or entities have a close relationship and engage in conduct giving rise to unjust enrichment, the perpetrators may be held jointly and severally liable for the disgorgement of illegally obtained proceeds. Casey and Huttner, for themselves and through their affiliates, obtained a benefit of approximately $30,000,000 in profits as a direct result of fraud and taking undue advantage of Alattar by using his legitimate business as a front for a pump and dump scheme. Accordingly, Alattar seeks disgorgement of all ill-gotten profits under the doctrine of unjust enrichment.

46.     As outlined above, Casey, Huttner, Mireskandari, Friedlander and Gann obtained shares of Top Gear stock from Alattar by taking undue advantage of Alattar and placing Alattar under duress as explained above. These Defendants are liable for rescission of all ill-gotten LUXR shares under the doctrine of unjust enrichment.

### Money Had and Received against Casey, Huttner, Top Gear, Mireskandari, Friedlander and Gann

47.     Alattar seeks the equitable remedy of money had and received against Casey and Huttner. Casey and Huttner, and their unnamed co-conspirators, earned approximately $30,000,000 in profits resulting from their pump and dump scheme that in equity and good conscience belongs in part to Alattar. Therefore, Alattar seeks forfeiture of all ill-gotten profits received by Casey and Huttner in connection with the pump and dump scheme.

48.     Alattar seeks the equitable remedy of money had and received against Mireskandari, Top Gear, Friedlander and Gann. Mireskandari, Top Gear, Friedlander and Gann received substantial consideration for assisting Casey and Huttner in avoiding liability for the pump and dump scheme by signing a release and waiver of claims

22

against Casey and Huttner. In equity and good conscience, the consideration received belongs to Alattar. Therefore, Alattar seeks forfeiture of all consideration received by Mireskandari, Top Gear, Friedlander and Gann in exchange for their execution of the release and waiver.

### Constructive Trust against Casey, Huttner, Top Gear, Mireskandari, Friedlander and Gann

49. Alattar is entitled to the equitable remedy of constructive trust with respect to Casey and Huttner because of their perpetration of the pump and dump scheme as outlined above. Casey and Huttner committed actual fraud as described above in connection with the reverse merger transaction and promises to build a viable business venture. This actual fraud has resulted in unjust enrichment to Casey and Huttner, and their affiliates, in the form of approximately $30,000,000 in ill-gotten profits. Alattar seeks the remedy of constructive trust in the amount of all ill-gotten profits resulting from the pump and dump scheme.

50. Alattar is entitled to the equitable remedy of constructive trust with respect to Mireskandari and Top Gear because of Mireskandari's breach of special trust and fiduciary duty in connection with his signing of a release and waiver of claims against Casey and Huttner for substantial consideration. Mireskandari has been unjustly enriched as a result of this breach of special trust and breach of fiduciary duty. Therefore, Alattar seeks the equitable remedy of constructive trust in the amount of money received by Mireskandari and Top Gear received for improperly signing the release and waiver. Finally, Alattar seeks the equitable remedy of constructive trust against Friedlander and Gann as a result of their concerted efforts to assist Casey and Huttner.

23

## *Exemplary Damages*

51.     The actions of Casey, Huttner, Top Gear, A&J, Friedlander and Gann surrounding the reverse merger transaction constitute fraud, malice and/or gross negligence.  The actions of Casey, Huttner and Mireskandari in inducing Alattar to transfer large blocks of LUXR shares to them constitute fraud, malice and/or gross negligence.  The actions of Casey, Huttner, Mireskandari and Top Gear surrounding the offer and acceptance of the release and waiver similarly constitute fraud, malice, and/or gross negligence.  Alattar therefore seeks exemplary damages against all Defendants pursuant to Chapter 41 of the Texas Civil Practice & Remedies Code.

52.     In addition to exemplary damages, Alattar seeks to remove the cap on exemplary damages pursuant to Section 41.008(c) of the Texas Civil Practice and Remedies Code.  Casey, Huttner, Mireskandari and Top Gear's actions surrounding the signing of the release and waiver agreement constitute commercial bribery in violation of Section 32.43 of the Texas Penal Code.  Casey and Huttner's actions surrounding the reverse merger transaction constitute the securing of a document by deception in violation of Section 32.46 of the Texas Penal Code.  Therefore, there is no cap on exemplary damages under the Texas Civil Practice & Remedies Code Section 41.008(c).

## DAMAGES AND JURY DEMAND

53.     Alattar seeks actual damages, exemplary damages, exemplary damages in excess of the statutory limitation, disgorgement of profits, attorney's fees, expert witness fees, costs for copies and depositions, court costs, pre-judgment interest, and post-judgment interest.  Plaintiff requests trial by jury and tenders the appropriate fee.

24

## REQUEST FOR RELIEF

Alattar requests that Defendants be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for Alattar against Defendants for an amount to be determined at trial, plus attorneys' fees, court costs, and pre- and post-judgment interest at the maximum rate permitted by law, and such other and further relief to which Alattar may be entitled.

Respectfully submitted,

FAUBUS & SCARBOROUGH LLP

By: _____
Harry L. Scarborough
State Bar No. 24027838
Brian Keller
State Bar No. 00784376
Mitchell A. Greene
State Bar No. 24078591
1001 Texas Avenue, 11th Floor
Houston, Texas 77002
(713) 222-6400
(713) 222-7240 – Fax

*Attorneys for Plaintiff Khaled Alattar*

25

Certified Document Number: 53387863 - Page 25 of 25



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   September 30, 2014

Certified Document Number:        53387863 Total Pages:  25

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

TAB B

| | | |
|---|---|---|
| **KHALED ALATTAR,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| *Plaintiff*, | § | |
| | § | **HARRIS COUNTY, TEXAS** |
| **v.** | § | |
| | § | |
| **KEVAN CASEY, ET AL.,** | § | |
| | § | |
| *Defendants.* | § | **113th JUDICIAL DISTRICT** |

## PLAINTIFF'S NINETEENTH AMENDED PETITION

Plaintiff, Khaled Alattar, files this Nineteenth Amended Petition against Defendants, Kevan Casey, Top Gear, Inc. n/k/a Luxeyard, Inc., Jonathan Friedlander, Scott Gann, Jonathan Camarillo, The Jonathan Camarillo Trust, Jinsun, LLC, Jeff Lamont, William W. Bartlett, Jr., Thomas Hudson, Brompton Group NA, LLC, Doug Shaw, Trevor Ling, Tobin Smith, Lawrence Isen a/k/a Isen Family Trust, Lance Baral, Kay Holdings, Inc., Joseph R. Lee, Equity Highrise, Inc., Mark Trotter, Tommy Allen, Far East Strategies, LLC, Acadia Holding Corporation, Lazy Bear, LLC, Lee Bear, LLC, Sun Bear, LLC and OSO Capital, LLC, and would show as follows:

### DISCOVERY CONTROL PLAN

1. Plaintiff intends for discovery to be conducted under Level 2 of Rule 190 of the Texas Rules of Civil Procedure.

### PARTIES

2. Plaintiff Khaled Alattar ("Alattar") is an individual residing in Sugar Land, Fort Bend County, Texas.

3. Defendant Kevan Casey ("Casey") has appeared and answered.

4. Defendant Top Gear, Inc. n/k/a Luxeyard, Inc. ("Top Gear") has appeared and answered.

5. Defendant Jonathan Friedlander ("Friedlander") has appeared and answered.

6. Defendant Scott Gann ("Gann") has appeared and answered.

7. Defendant Jonathan Camarillo ("Camarillo") has appeared and answered herein.

8. Defendant The Jonathan Camarillo Trust ("Camarillo Trust") has appeared and answered herein.

9. Defendant Jinsun, LLC ("Jinsun") has appeared and answered herein.

10. Jeff Lamont ("Lamont") has appeared and answered herein.

11. William W. Bartlett, Jr. ("Bartlett") has appeared and answered herein.

12. Thomas Hudson ("Hudson") has appeared and answered herein.

13. Brompton Group NA, LLC ("Brompton") has appeared and answered.

14. Doug Shaw has appeared and answered herein.

15. Trevor Ling has appeared and answered herein.

16. Tobin Smith is an individual residing in Maryland who may be served with process at 6116 Rosemont Cir., North Bethesda, Maryland 20852. He may also be served through his attorney, J. Randle Henderson.

17. Lawrence Isen a/k/a Isen Family Trust ("Isen") has appeared and answered herein.

18. Lance Baral ("Baral") has appeared and answered herein.

19. Kay Holdings, Inc. ("KHI") has appeared and answered herein.

20. Joseph R. Lee ("Lee") has appeared and answered herein.

21. Equity Highrise, Inc. ("EHI") has appeared and answered herein.

22. Mark Trotter ("Trotter") has appeared and answered herein.

23. Jeffrey A. Sater ("Sater") has appeared and answered herein.

24. Tommy Allen ("Allen") has appeared and answered herein.

25. Far East Strategies, LLC ("Far East") has appeared and answered herein.

26. Acadia Holding Corporation ("Acadia"), is a Delaware corporation and may be served through its registered agent The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Acadia Holding Corporation operates under the name Acadia Financial Group and is the US based holding corporation that owns Acadia Life International Limited and Acadia Life Limited, which are Bermuda entities. All of these entities operate as a single business enterprise. Upon information and belief, these entities are controlled by one of more of the Defendants.

27. Lazy Bear, LLC ("Lazy Bear") has appeared and answered herein.

28. Lee Bear, LLC ("Lee Bear") has appeared and answered herein.

29. Sun Bear, LLC ("Sun Bear") has appeared and answered herein.

30. Oso Capital, LLC ("Oso Capital") has appeared and answered herein.

## JURISDICTION AND VENUE

31. Jurisdiction and venue are proper in Harris County, Texas because Defendant Kevan Casey is a resident of Harris County, Texas, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Harris County, Texas. Further, Plaintiff seeks recovery in excess of the minimum jurisdictional limits of this Court. Additionally, Top Gear has had sufficient contacts with the State of Texas and has purposefully availed itself of the laws of this State. To subject Top Gear to jurisdiction in Texas would not offend traditional notions of fair play and justice. The causes of action against Top Gear arise out of Top Gear's contacts with this State. The

3

non-resident defendants have had sufficient contacts with the State of Texas and has purposefully availed itself of the laws of this State. Each out-of-state Defendant gave express authority to an in-state agent to act on their behalf. Moreover, each out-of-state Defendant accepted the benefits of conduct and contacts of the in-state perpetrator.

## SUMMARY

32. This is a suit for fraud and related claims arising out of an illegal "pump and dump" stock scheme.[1] A&J concedes this case involves a pump and dump.

33. Defendants' carefully-orchestrated plan involved a conspiracy to fraudulently acquire the stock of a small publicly traded company, then artificially inflate – or "pump" – the price of its shares through aggressive advertising, only to then rapidly sell – or "dump" – the stock at the inflated price. While such crimes are unfortunately quite prevalent, what makes this particular scheme unusual is that the underlying company was a legitimate business. The fraud in this instance was not so much on an unsuspecting public as on the company's co-founders – Alattar and Mireskandari – whose business was essentially hijacked by Defendants. The stock chart for Luxeyard and the stock chart for Casey's previous pump and dumps prove Casey committed fraud when he spoke to Alattar.

---

[1] http://www.sec.gov/answers/pumpdump.htm



1. **Their prior pump and dumps;**

   **The pumps:**

   a) that the stock price for their AFSE investment rose 6.333% over 25 trading days;

   b) that the stock price for their CGLO investment rose 570% over 14 trading days;

   c) that the stock price for their QWTR investment rose 129% over 41 trading days;

   d) that the stock price for their BERX investment rose 540% over 83 trading days;

   e) that the stock price for their CEHD investment rose 128% over 56 trading days;

f) that the stock price for their CMCI investment rose 167% over 7 trading days and then another 93.3% over 12 trading days;

g) that the stock price for their CNAM investment rose 198% over 24 trading days;

h) that the stock price for their WKBT investment rose 63.6% over 15 trading days and then another 52.9% over 8 trading days;

i) that the stock price for their PMAH investment rose 900% in 8 trading days.

**The dumps:**

a) that the stock price for their AFSE investment dropped 94.3% over 12 trading days;

b) that the stock price for their CGLO investment dropped 91% over 50 trading days;

c) that the stock price for their QWTR investment dropped 93.6% over 132 days;

d) that the stock price for their BERX investment dropped 95% over 122 trading days;

e) that the stock price for their CEHD investment dropped 96.7% over 175 trading days;

f) that the stock price for their CMCI investment dropped 82% over 43 trading days;

g) that the stock price for their CNAM investment dropped 69.9% over 77 trading days;

h) that the stock price for their WKBT investment dropped 78% over 77 trading days;

i) that the stock price for their PMAH investment dropped 80% over 24 trading days.

34. The success of Defendants' pump and dump scheme is illustrated by the chart below, showing the track record of this "penny stock" during the relevant time period:

6



35. The dramatic rise – and later fall – of the stock price as shown in the above chart resulted in an approximately $30,000,000.00 windfall in just 60 days. The maximum amount of Plaintiff's recovery pursuant to disgorgement of profits is approximately this amount. This pump and dump, and many others just like it, are evidence of Defendants' state of mind at the time this made the representations discussed below. Defendants, and other unnamed co-conspirators, reaped a huge benefit at Alattar's expense, whose own stock was restricted and thus could not be sold. Notably, Defendants profited through the use of dummy companies they formed, which were alter egos of Defendants, and which Defendants controlled for purposes of reaping these profits. Alattar seeks actual damages and, in equity, disgorgement of profits to prevent Defendants' unjust enrichment.

**FACTUAL BACKGROUND**

36. LuxeYard is an online purveyor of luxury goods that follows the "flash sale" retail model used by Ruelala.com, Gilt.com, OneKingsLane.com and others.[2]

---

[2] http://www.luxeyard.com/living/about

Alattar conceived of the idea for LuxeYard in December 2010 and pitched it to a business associate – Mireskandari – with whom Alattar shared office space. Impressed with the concept, Mireskandari partnered 50/50 with Alattar to form LY Retail LLC ("LY") to develop Alattar's idea. The purpose of the company was simple: to own and operate an e-commerce website through which LY could sell luxury home goods using the "flash sale" retail model. Alattar was responsible for acquiring the domain, branding, website development, incorporation, and developing a detailed business plan. Mireskandari was responsible for lining up future product suppliers and generating industry buzz for their new venture. The domain www.luxeyard.com became active in May 2011.

37. In August 2011, as Alattar's idea went from concept to reality, Alattar and Mireskandari agreed that LY needed additional capital to become fully operational and for future growth. To accomplish this goal, Mireskandari was placed in touch with Casey, who was represented to Mireskandari as being a knowledgeable and reputable businessman with experience in raising capital. Unknown to Alattar and Mireskandari, Casey was previously involved in other pump and dump schemes, but failed to disclose this material fact. It did not take long for Casey, and presumably others acting in concert with him, including Friedlander and Gann, to see the potential to scam Alattar and Mireskandari. By the end of August 2011, Casey sketched out a detailed plan – undisclosed to Alattar and Mireskandari – to pump and dump future LY stock.

38. Casey outlined what sounded like a simple, honest mechanism by which LY could obtain the financing it needed by going public. The plan, as explained to Alattar and Mireskandari, was to turn LY into a publicly traded company through a

8

reverse merger.[3] A reverse merger is an SEC-authorized means of taking a private company public in a relatively short period of time and with substantially less hassle than an initial public offering. A reverse merger occurs when a private operating company wishing to go public is acquired by a non-operating, public "shell" corporation. Typically, the owners of the private operating company exchange their ownership interest in the private company (in this case, LY) for the outstanding shares of the public company (in this case, Top Gear). After the "merger," the public company changes its name to that of the previously private company and begins operating as such, precisely what occurred in this case.

39. In this case, the proposed shell company was a Delaware corporation named Top Gear. Casey represented to Alattar and Mireskandari that reverse merging with Top Gear would provide funding for LY, allow LY to increase operations and grow its business, and access capital markets. Casey contends that at all times, everything he did and failed to do was through Jinsun.

40. Additionally, Mireskandari and Alattar produced their business plan to the Casey team in August 2011, and although the Casey team provided comments thereto, the Casey team never mentioned that the entire plan was impossible in light of the looming pump and dump known only to the Casey team. On the contrary, the Casey team said they were agreeable to funding the proposed plan – not one that recognized a short-lived company used for purposes of a pump and dump scheme.

41. Casey characterized the end game as one in which Top Gear would, in the future, become a premier web-based group-buying retailer of luxury products at deep discounts to retail prices. To accomplish this goal, he represented that Top Gear would

---

[3] http://www.sec.gov/investor/alerts/reversemergers.pdf

initially acquire a strong subscriber base, and thereafter, attract recognizable merchants. Casey said that the initial plan was to offer household goods and related items, and then, over time, Top Gear would expand its offerings to include a broad scope of products. Through his meetings with Alattar and Mireskandari, not to mention written material, Casey distinguished steps that Top Gear would take in the first twelve months, from those that would be taken in the following years, and likewise, from those that would be taken many years down the road. These representations, made by Casey and A&J, were completely false and made with the intent to induce Alattar and Mireskandari into executing the reverse merger transaction. Casey and A&J's actual intent was to use LY and Top Gear to perpetrate a quick pump and dump scheme with the help of Friedlander and Gann. Had Alattar known Casey's actual intent was to dump their shares a few months later, he would not have sold his interest in LY to Top Gear.

42. The specifics of the events leading up to the reverse merger are as follows. After several conference calls and emails, on or about August 28, 2011, Casey proposed a deal. Then, at this time, Defendants themselves valued Plaintiff's creation at $3,000,000. Alattar received a term sheet relating to the proposed deal on September 7, 2011. LY and Casey's company, Far East Strategies LLC, (Casey's company) executed the term sheet on September 18, 2011.

43. Casey referred Alattar, Mireskandari and LY to the law firm of A&J, who they subsequently hired to consummate the transaction. Unbeknownst to Alattar and Mireskandari, their attorneys were not only fully aware of Casey's actual intentions, but intended to assist him in the scheme to defraud Alattar and Mireskandari. In a brazen act of fiduciary malfeasance, A&J papered *all* sides of the transaction – the pre-merger acquisition of Top Gear by Casey, Friedlander, Gann, and their affiliates, the

distribution of Top Gear shares, the reverse merger, the shareholder agreements, and all of the pre- and post-merger SEC filings – all while never disclosing to Alattar and Mireskandari that Casey, Friedlander and Gann, and their affiliates intended to defraud them. A&J assisted Casey on other pump and dumps.

44. The reverse merger was executed on November 8, 2011. Unbeknownst to Alattar, Mireskandari and LY, A&J was simultaneously representing Casey in connection with their plans to use Top Gear to perpetrate the pump and dump scheme. A&J denied this representation on October 27, 2011. In fact, A&J represented Casey in their acquisition of Top Gear on November 7, 2011; that is, the *day before* Top Gear acquired LY in the reverse merger. In other words, Casey, Friedlander and Gann (Texas residents), and their affiliates, had, with A&J's direction and purposeful assistance, already obtained all of the ostensibly unrestricted, or free trading, stock in the shell company that was supposed to be merged with LY. Thus, Casey and his team (Texas residents) controlled Top Gear prior to the November 8, 2011. The resulting arrangement materially differed from the one represented to Alattar and Mireskandari.

45. Not long after Top Gear changed its name and stock symbol, Casey, with the help of A&J, and Friedlander, financed and executed an aggressive marketing campaign designed to artificially inflate the price of LUXR stock. In that effort, they were very successful. Shortly thereafter, Casey, Friedlander, Gann, and their affiliates, dumped a large volume of supposedly unrestricted shares — shares that should have been restricted. As expected, following a massive sell-off, the stock price plummeted to $.10. Instead of aiding LY in many years of continued growth by going public and raising operating capital as they had represented to Alattar and Mireskandari, Casey – and his co-conspirators – pocketed enormous profits through the pump and dump

11

scheme, and left Alattar and his legitimate business venture at the bottom of a death spiral from which it may never recover. The co-conspirators included Friedlander and Gann. From Alattar's perspective, the entire purpose of the transaction was completely frustrated. From Defendants' perspective, it was a huge success, albeit at Alattar's expense. Put simply, had Alattar known of Defendants' true intentions, he would *never* have agreed to sell his interest in LY, which would instead have pursued a legitimate business transaction.

46. As to the overwhelming evidence that A & J breached its fiduciary duty to Alattar in many ways, A & J:

- failed to inform Alattar that he should hire independent counsel to determine if Alattar's interests were materially and directly adverse to the interests of A & J's other clients;

- failed to inform Alattar that he should hire independent counsel to determine if A & J's representation of him reasonably appeared to be adversely limited by A & J's responsibility to another client;

- failed to inform Alattar that he should hire independent counsel to determine if A & J's representation of him reasonably appeared to be adversely limited by A & J's responsibility to A & J's own interests;

- never told Alattar that A & J had previously represented Casey and his team on other matters substantially related to the transaction at issue; that is the Securities and Exchange Agreement;

- never told Alattar that although Alattar would be locked up for 18 months, and thereby prevented from selling his shares for 18 months, the other parties to the transaction were *not* subject to the same restriction;

- never told Alattar that the mere fact that he was the only purported signatory subject to an 18 month lock up agreement was a red flag that the other parties to the transaction would take advantage of him and ultimately dump their shares in LuxeYard;

- never provided Alattar with a complete copy of the relevant document- the Securities Exchange Agreement;

12

- never talked to Alattar to confirm that the document A & J prepared- the Securities Exchange Agreement- was consistent with what the other parties to the transaction (A & J's other clients) had told Alattar as far as the material terms and conditions were concerned;

- never told Alattar that the Securities Exchange Agreement was extremely *unfavorable* to Alattar, and very *favorable* to A & J's other clients;

- never provided Alattar with the written and oral information A & J received from A & J's other clients so that A & J could prepare the Securities Exchange Agreement;

- never informed Alattar that A & J was in a position of "conflict of interest" and that Alattar needed independent counsel to evaluate the Securities Exchange Agreement.;

- never informed Alattar of the significance of the "Waiver of Reliance" provision in the Securities Exchange Agreement (which Alattar also never saw);

- failed to inform Alattar that A & J was representing Casey on other substantially related transactions at the same *time* A & J represented Alattar and Casey on the transaction at issue;

- failed to inform Alattar of the significance of the term "insider" contained in the term sheet;

- failed to obtain from Alattar all of the documents he received from Casey, so that A & J could confirm that the Securities Exchange Agreement comported with what Alattar had been promised;

- failed to investigate and determine whether the parties with whom Alattar was entering into the Securities Exchange Agreement had been involved in other pump and dump schemes;

- failed to inform Alattar that A & J knew Casey had been involved in other penny stock pump and dump schemes. Upon information and belief, Defendants were involved in numerous other "pump and dump" schemes in violation of state laws, federal laws, and SEC regulations;

- failed to inform Alattar of the disadvantages of an 18 month lock up agreement whereby *no* other party to the transaction is subject to the same restriction;

- never informed Alattar that on the same day he was selling his interest in LY to Top Gear, A & J was drafting documents that gave control of Top Gear to Casey and three individuals under SEC permanent injunctions- Mark Trotter, Scott Gann and Larry Isen;

- concealing the fact that three days after the Securities Exchange Agreement became effective, Casey instructed A & J to transfer massive amounts of Top Gear stock to Casey and his inner circle so that would be in an ideal position to pump and dump the stock at an enormous profit;

- concealing the fact that it was drafting the stock purchase agreements pursuant to which Casey and his inner circle acquired massive amounts of Top Gear stock from Israeli shareholders (assuming they even exist) at the exact time A & J was drafting an 18 month lock up agreement for Alattar;

- concealing the fact it provided information it knew to be false to the transfer agent so that Casey and his inner circle could amass control of the unrestricted shares Top Gear (which later became LuxeYard);

- improperly advised Alattar on February 13, 2012 that Casey was not an "affiliate" of LuxeYard;

- failed to advise Alattar as to the meaning and import of the term "affiliate" in the letter dated February 13, 2012;

- failed to advise Alattar that he needed separate counsel to determine if, in fact, Casey was an "affiliate" of LuxeYard;

- failed to inform Alattar that, with respect to the email dated February 13, 2012, A & J was in position of "conflict of interest" and that A & J was advocating in favor of one client (Casey), at the expense of another (Alattar); and

- failed to inform Alattar that he needed independent counsel to determine if A & J was called upon to espouse a position adverse to Alattar's interests in the email dated February 13, 2012.

47. It should be noted that:

1. Rule 1.06(b)(1) prohibited A & J from representing two clients whose interests were "materially and directly adverse";[4]

2. Rule 1.06(b)(2) prohibited A & J from representing Alattar because A & J's representation was "adversely limited" by A & J's responsibilities to another client;

3. Rule 1.06(b)(2) prohibited A & J from representing Alattar because A & J's representation was "adversely limited" by A & J's own financial interests;

---

[4] The following "Rules" refer to the Texas Disciplinary Rules of Professional Conduct.

14

4. Rule 1.06(d) and Rule 1.07(b) prohibited A & J from representing Casey in a dispute between Casey and A & J's other clients;

5. Rule 1.07(b) prohibited A & J from acting as an intermediary between Casey and Alattar in the formation of new entities without consulting with Alattar on the relevant considerations and decisions he needed to make;

6. Rule 1.07(a) prohibited A & J from representing multiple parties in the drafting of various documents without explaining the implications of common representation to Alattar and obtaining written consent to the common representation; and

7. Rule 1.08(a) and Rule 1.06(b)(2) prohibited A & J from representing Alattar without disclosing A & J was representing Casey on other matters at the same time.

## CAUSES OF ACTION[5]

### *Common Law Fraud by Friedlander and Casey, Jinsun, Top Gear, and Friedlander and each of the companies they control*

48. Plaintiff incorporates all allegations contained in the foregoing paragraphs.

49. A&J, Casey, and Friedlander, individually and on behalf of Top Gear, committed fraud by making material misrepresentations to Alattar leading up to the reverse merger transaction between Top Gear and LY, which they knew to be false or, as admitted by A&J under oath, asserted recklessly without knowledge of their falsity. At the time these representations were made, Casey and his affiliates owned a controlling interest in Top Gear. The false material representations made to Alattar included the following:

a. the Top Gear-LY reverse merger would be for the purpose of raising capital for LY, allowing LY to increase operations and grow the business for years to come, and further allowing LY access to capital markets (and potentially more funding) in the future;

---

[5] These claims exist pursuant to Sections 101.463(b) and (c) of the Texas Business Commerce Code. These claims are asserted in Alattar's individual capacity.

b. Casey would provide $500,000 in working capital to LuxeYard upon completion of the reverse merger;

c. Casey would provide $500,000 for the acquisition of a public shell;

d. Casey would provide $500,000 to raise market awareness of LuxeYard's business so LuxeYard could raise capital; and

e. upon completion of the reverse merger, all shares held by officers and insiders would be "locked-up," i.e., unable to be sold, for 18 months after the closing date.

None of these statements were true. Indeed, Casey always (and secretly) intended to dump his shares in LuxeYard within a matter of months.

50. These representations were made through the term sheet provided to Alattar as well as several conference calls and emails to Alattar directly, or to Mireskandari with the intent that the information be relayed to Alattar. These representations were material in that a reasonable person would attach importance to and be induced to act on the information in determining whether to enter into the reverse merger transaction. These representations were false in the following ways: (1) the true purpose of the reverse merger was not for the benefit of LY, but for the purpose of perpetrating a quick pump and dump scheme for the benefit of Casey and his affiliates; (2) Casey did not provide the working capital as represented; (3) any money invested by Casey for marketing was not used for the legitimate purpose of promoting the new company, but was instead used to artificially inflate LUXR stock so it could be quickly sold in a massive illegal share dump; and (4) Casey and his affiliates – clearly an "insider" within the meaning of the term sheet – did not lock-up his shares, but instead sold them in huge blocks that severely damaged LUXR's share price and reputation.

51. Additionally, Mireskandari and Alattar produced their business plan to the Casey team in August 2011, and although the Casey team provided comments thereto, the Casey team never mentioned that the entire plan was impossible in light of the looming pump and dump known only to the Casey team. On the contrary, the Casey team said they were agreeable to funding the proposed plan – not one that recognized a short-lived company used for purposes of a pump and dump scheme.

52. These Defendants' actions immediately following the reverse merger and the subsequent success of the pump and dump scheme make it clear that the misrepresentations were made to Alattar with knowledge of their falsity. Casey made the misrepresentations to Alattar with the intent that they be acted upon. Specifically, the misrepresentations were made with the intent that Alattar would be induced into executing the reverse merger. Alattar relied upon these misrepresentations in agreeing to the reverse merger and would not have entered into that transaction had he known the true intent of Casey. Alattar has been injured as a result of this fraud, and seeks disgorgement of all ill-gotten profits obtained by these Defendants as a result of the fraud. In addition, Alattar seeks actual damages.

53. Casey and Friedlander committed fraud by making false material representations to Alattar in connection with certain stock purchase agreements, whereby Alattar was induced into transferring his shares of Top Gear to Casey after that merger. Casey represented to Alattar that Alattar had an obligation to raise money for LuxeYard, and because of his alleged failure to do so he must give up his shares to him. Casey represented that he would use the shares Alattar gave up to raise additional capital. In fact, Casey distributed these shares to his affiliates or kept them for own benefit in furtherance of the pump and dump scheme. These representations were false

17

when made and were intended to induce Alattar to give up valuable shares for little to no consideration. Alattar relied on these representations and would not have transferred his shares had he known that Casey intended to use the shares for his own benefit instead of the benefit of the company. Alattar would not have relinquished these shares had he known that he had no obligation to raise capital.

54. Defendants committed fraud by making material misrepresentations to Alattar leading up to the reverse merger transaction between Top Gear and LY, which he knew to be false or asserted recklessly without knowledge of its falsity. Alattar has been injured as a result of this fraud. Alattar seeks damages equal to the 50% ownership interest in the enterprise that he gave up in consideration for the reverse merger transaction.

55. Defendants further committed fraud by making false material representations, both individually and on behalf of LuxeYard as its executive, in connection with certain stock purchase agreements, whereby Alattar was induced into transferring more than half of his LUXR shares. Casey represented to Alattar that Alattar had an obligation to raise money for LuxeYard, and because of his failure to do so he must transfer his shares to others. These representations were false when made and were intended to induce Alattar to relinquish valuable shares for little to no consideration.

56. Friedlander misrepresented and actively concealed his purported experience, his advertised skill set, the nature of the individuals with whom he would be working, that they were known criminals, his previous involvement with A&J, his opinions regarding Luxeyard's expected revenue, that he was involved in prior pump and dumps, that he participated in hand-picking employees who were advertised as

18

strangers (when they were not) and more. Gann actively concealed the prior pump and dumps, that he was fined and penalized by the Fifth Circuit as follows:

- "The district court found Gann not credible and determined that he had violated Section 10(b) and Rule 10b-5;"

- "Gann and Fasciano opened 21 accounts for nine HCM affiliates, albeit the investors in each were the same;"

- "After receiving a block notice, Gann and Fasciano would switch the identifier number they were using, enabling them to continue trading, at least temporarily;"

- "The material misstatements at issue are Gann's use of different and varying client account numbers to disguise the frequency and magnitude of HCM's trading in the various funds;"

- "The district court held that Gann's practice of switching identifying broker and client account numbers constituted materially misleading statements in violation of the securities laws;"

- "The SEC's proof that Gann's use of different numbers to conduct his trades demonstrated that he did not want the fund companies catching on this his trading practices;"

- "In one instance, Fasciano traded a Goldman Sachs fund three times and received a block notice, yet he and Gann placed five more trades under a difference number, received two more block notices, and still continued placing trades;"

- "We view the SEC's characterization of the use of multiple registration and account numbers as ample evidence of an intent to mislead;"

- "The SEC's chief evidence of Gann's intent to deceive was his use of numerous account and registration numbers that actually represented his (and Fasciano's) work for HCM. The SEC contended that Gann's efforts were meant to circumvent the funds' regulations for his own gain and that of his customer;" and

- "For the foregoing reasons, the judgment of the district court is AFFIRMED."

Gann also concealed his plan to trade on material nonpublic information.

57.     Alattar also contends Friedlander (and Equity Highrise) and Gann (and his companies) aided and abetted by overtly assisting Casey in obtaining shares beneath

19

the 10% restriction while in fact controlling much more. Friedlander also assisted Casey by, as shares were sold throughout 2012, misrepresenting the value of the shares by concealing what was known only to Friedlander and Casey, but not Alattar. Friedlander and Gann also concealed the fact that they were uniquely aware of inside information about the status of the issues (Top Gear and Luxeyard) each time Alattar was asked to invest more in the company. Friedlander and Gann had actual and general awareness of their role in tricking Alattar into the SEA as well as the series A-D financing because they participated in many prior pump and dumps with Casey and other known criminals. When they acted, wrote, communicated and concealed material facts from Alattar, they did so with intent to deceive Alattar. All of these communications were to Alattar and/or they had a reason to expect the communications would be presented to Alattar. The above conduct substantially assisted Casey and the other insiders in facilitating the illegal pump and dump and in helping Casey avoid the restrictions placed on beneficial owners of greater than 10% on a company's outstanding shares. *See* 15 U.S.C. § 78p; 17 C.F.R. § 240.16a-1; 15 U.S.C. §78m(d)(3); Anslow Deposition at pp. 134, 226. They also assisted Casey in tricking Alattar (and others) into making subsequent investments. They also made misrepresentations in the representations and warranties they signed in the Subscription Agreement, including:

- "There is no Action pending against, or to the Knowledge of such Investor, threatened against or affecting, such Investor by any Governmental Authority or other Person with respect to such Investor that challenges, or may have the effect of preventing, delaying, making illegal, or otherwise interfering with, any of the transactions contemplated by this Agreement."

- "Such Investor is acquiring such the Securities proposed to be acquired hereunder for investment for its own account and not with a view to the resale or distribution of any part thereof, and such Investor has no present intention of selling or otherwise distributing such Securities, except in compliance with applicable securities Laws."

20

- "Such Investor further acknowledges that if the Securities are issued to such Investor in accordance with the provisions of this Agreement, such Securities may not be resold without registration under the Securities Act or the existence of an exemption therefrom."

- "Such Person will not sell or otherwise transfer the Securities, unless either (A) the transfer of such securities is registered under the Securities Act or (B) an exemption from registration of such securities is available."

- "Such Investor has not directly or indirectly, nor has any person acting on behalf of or pursuant to any understanding with such Investor, engaged in any transaction in the securities of the Company (including, without limitation, Short Sales involving the Company's securities) since the time that such Investor was first contacted by the Company regarding the investment in the Company contemplated herein."

58.    In addition, Friedlander and Gann knowingly cashed the proceeds of the illegal enterprise. *U.S. v. Salmonese,* 352 F.3d 608 (2d Cir. 2010); *U.S. v. Loe*, 248 F.3d 449 (5th Cir. 2001); *U.S. v. Girard*, 744 F.2d 1170, 1171 (5th Cir. 1984). They also knowingly refused to provide documents and knowingly took positions in open court on the record that were the exact opposite of what their lawyer was told from the California bankruptcy lawyer hired to represent Casey and Gann.  Finally, it was unlawful to trade stock on material nonpublic information and, a conspiracy may be based on lawful conduct through unlawful means.  Their overt acts need not "be" the unlawful act or controlling fact.  Conspiracy involves participation in a tort and does not require independent liability.

59.    The above conduct was performed by assisting or encouraging; assisting or participating; or concert of action under Restatement (Second) of Torts §876, and each aider and abettor had actual knowledge of the conduct of the primary actor and its effects.  Each aider and abettor substantially assisted the primary actor(s) by concealing material facts, artificially inflating trading volume through fake accounts, shorting the

21

very stock they promoted, by trading on material nonpublic information, distributing secret free trading shares, and knowing cashing and retaining the ill gotten profits (which alone is a sufficient overt act to compose liability). *U.S. v. Salmonese,* 352 F.3d 608 (2d Cir. 2010); *U.S. v. Loe*, 248 F.3d 449 (5th Cir. 2001); *U.S. v. Girard*, 744 F.2d 1170, 1171 (5th Cir. 1984). Each aider and abettor also substantially assisted the primary actor(s) by attempting to avoid "affiliate" status, concealing the background of the officers they hand picked, conspiring with A&J, engaging in a secret and self funded media blitz that contained misrepresentations, and selling all of their shares at a pre-determined time.

### *Fraud by Nondisclosure against Casey, Jinsun, Top Gear, Friedlander, Gann and each of the companies they control*

60. Plaintiff incorporates all allegations contained in the foregoing paragraphs.

61. A&J, Casey, Friedlander, and Gann, individually and on behalf of Top Gear, committed fraud by nondisclosure in connection with the reverse merger transaction by failing to disclose new material information when that material information made earlier representations misleading or untrue. In this case, Casey, Friedlander, and Gann made material representations to Alattar as described above. Those representations became misleading and untrue before the reverse merger took place because Casey knew that he would not be involved in LuxeYard for more than a few months, much less many years, they knew they would not be subjecting themselves to any lock-up agreements as they had previously agreed, and they knew that the stated purpose of the reverse merger was actually to perpetrate a rapid pump and dump scheme. Casey knew that Alattar was ignorant of the facts concerning the lock-up

22

agreements and the quick pump and dump scheme and did not have an equal opportunity to discover the truth. Moreover, Defendants were deliberately silent and failed to disclose these facts with the intent to induce Alattar to enter into the reverse merger transaction and continually build a viable company for years to come. In this regard, Alattar acted in reliance on the omission or concealment and suffered injury as a result of acting without knowledge of the undisclosed facts. Alattar seeks disgorgement of all ill-gotten profits resulting from the fraud by nondisclosure as well as actual damages.

62. A&J failed to correct all of the statements it made in the transaction documents, which documents were based on A&J legal judgment and discretion. Defendants committed fraud by nondisclosure in connection with the reverse merger transaction by failing to disclose new material information when that material information made earlier representations misleading or untrue. In this case, Defendants made material representations to Alattar as described above. Defendants knew that Alattar was ignorant of the facts concerning the lock-up agreements and did not have an equal opportunity to discover the truth. Moreover, they were deliberately silent and failed to disclose these facts with the intent to induce Alattar to enter into the reverse merger transaction. In this regard, Alattar acted in reliance on the omission or concealment and suffered injury as a result of acting without knowledge of the undisclosed facts. Alattar seeks disgorgement of profits and his actual damages.

### *Statutory Fraud against Gann, Casey, Jinsun, Top Gear and Friedlander and each of the companies they control*

63. Plaintiff incorporates all allegations contained in the foregoing paragraphs.

64. Casey, Gann, and Friedlander, individually and on behalf of Top Gear, committed statutory fraud in violation of Texas Business & Commerce Code Section 27.01 in connection with the reverse merger transaction and supposed plans to build a premier web-based seller of a broad scope of luxury items. Casey, Gann, and Friedlander knew all along that LuxeYard would never reach the "broad scope" phase. They made false representations of fact as well as false promises to Alattar as described above. These false representations and promises were made for the purpose of inducing Alattar into entering into the reverse merger transaction. Alattar relied on these false representations and promises when he entered into the transaction, and this reliance caused him injury. Alattar seeks disgorgement of all ill-gotten profits received by Casey as a result of this fraud, as well as actual damages.

65. In addition, the actions of Casey, Gann and Friedlander in connection with the stock purchase agreements described above constitute statutory fraud in violation of Texas Business & Commerce Code Section 27.01. These defendants made misrepresentations of fact and false promises, outlined above, to Alattar for the purpose of inducing Alattar into transferring large blocks of LUXR shares for nominal consideration. Alattar relied on these false representations and promises.

### *Breach of Fiduciary Duty against Gann, Friedlander, Casey and each of the companies they control*

66. Plaintiff incorporates all allegations contained in the foregoing paragraphs.

67. A&J had an attorney-client relationship with Alattar and LY. A&J solicited LY as a client. Alattar was a member of LY. A&J exercised legal judgment discretion in drafting dozens of documents for Alattar. As Alattar's attorneys, A&J owed a fiduciary

24

duty to Alattar. A&J breached its fiduciary duties by, among other things, (1) assisting Casey's inducement of Alattar into not only the reverse merger transaction, but the agreement to work together to build a venture that would last for years to come for purposes of engineering the quick pump and dump scheme, (2) failing to disclose Casey's scheme, (3) failing to disclose A&J's own role in the scam, (4) failing to take steps to prevent the fraud, (5) failing to disclose the fraud after it occurred, and (6) failing to disclose A&J's conflict of interest. A&J assisted Casey in connection with his acquisition of the controlling interest of Top Gear, and A&J prepared the contracts and other documents for the reverse merger transaction at Casey's direction. These actions constitute a breach of their fiduciary duty to Alattar, and Alattar has suffered injury as a result. Alattar seeks forfeiture of all fees paid to A&J in connection with its representation of Alattar and LY, as well as actual damages. The Defendants conspired with A&J.

68. Casey and Friedlander owed a fiduciary duty to Alattar because of their dominance and control over the decision making and daily business affairs of Luxeyard, a closely-held public company. Under the law, Casey, Gann, and Friedlander also owed a fiduciary duty to Alattar because they were in possession of material nonpublic information that they concealed from Alattar. They also owed a fiduciary duty under the law as both an officer and insider of the company. They also owed a fiduciary duty because they were an affiliate of the company. They also owed a fiduciary duty because they acted as the agent for the principal, Alattar, by perpetrating the fraud in connection with taking Luxeyard public. They also owed a fiduciary duty because they placed themself in the position of a moral and special relationship of trust and confidence where they promised to guide Alattar through the reverse merger process as well as the

25

"market awareness" process. Unfortunately, they exercised dominance and undue influence over Alattar. Casey and his team knew that Alattar relied on Casey for moral and professional guidance, and that reliance was justifiable. Additionally, Casey controlled Top Gear, and he acted as the securities broker for Top Gear by giving Top Gear stock to his insiders and Alattar. A broker owes a fiduciary duty to its customers. Finally, Casey and Alattar formed a joint venture relationship and binding contract in the Term Sheet. At that time, he then owed a fiduciary duty to his co-venture. He knowingly ignored the representations in the Term Sheet, and he failed to disclose in the Term Sheet the dozens of pump and dumps that he and his gang had previously perpetrated. He even failed to disclose the pump and dumps he was perpetrating on the very day he bound Alattar in the Term Sheet to a "no shop" provision. Casey breached his fiduciary duties to Alattar by making false representations of fact to Alattar, making false promises to Alattar, and engaging in the illicit conduct described above. Casey, Gann, Friedlander and each of their companies owed a fiduciary duty because they possessed and traded on material nonpublic information, and because Casey and Friedlander were officers and insiders. Each of these constituents and the companies they control breached that duty by never disclosing the truth that their past, the truth about their future services and that they were going to trade on material nonpublic information. These breaches have caused injury to Alattar and substantial benefit to Casey. Thus, Casey is liable to Alattar for actual damages and for disgorgement of all ill-gotten benefits.

***Violation of the Texas Securities Act against Casey, Jinsun, Friedlander and Gann, and each of the companies they control***

69.    Plaintiff incorporates all allegations contained in the foregoing paragraphs.

70.    As outlined above, Casey offered or sold securities to Alattar by means of an untrue statement of material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading. TEX. VERNON'S ANN. CIV. ST. ARTS. 581-1 et seq. Casey violated the Texas Securities Act by misrepresenting and/or omitting the disclosure of material facts. Casey is liable under the civil penalty provisions of the Texas Securities Act. TEX. REV. CIV. STAT. ANN. ART. 581-33. Casey bought, sold, and issued securities using fraudulent means and communications in direct violation of the civil penalty provisions of the act. A&J, Freidlander and Gann are liable under the Act as far as aiders and abettors.

71.    Friedlander misrepresented and actively concealed his purported experience, his advertised skill set, the nature of the individuals with whom he would be working, that they were known criminals, his previous involvement with A&J, his opinions regarding Luxeyard's expected revenue, that he was involved in prior pump and dumps, that he participated in hand-picking employees who were advertised as strangers (when they were not) and more. Gann actively concealed the prior pump and dumps, that he was fined and penalized by the Fifth Circuit as follows:

- "The district court found Gann not credible and determined that he had violated Section 10(b) and Rule 10b-5;"

- "Gann and Fasciano opened 21 accounts for nine HCM affiliates, albeit the investors in each were the same;"

27

- "After receiving a block notice, Gann and Fasciano would switch the identifier number they were using, enabling them to continue trading, at least temporarily;"

- "The material misstatements at issue are Gann's use of different and varying client account numbers to disguise the frequency and magnitude of HCM's trading in the various funds;"

- "The district court held that Gann's practice of switching identifying broker and client account numbers constituted materially misleading statements in violation of the securities laws;"

- "The SEC's proof that Gann's use of different numbers to conduct his trades demonstrated that he did not want the fund companies catching on this his trading practices;"

- "In one instance, Fasciano traded a Goldman Sachs fund three times and received a block notice, yet he and Gann placed five more trades under a difference number, received two more block notices, and still continued placing trades;"

- "We view the SEC's characterization of the use of multiple registration and account numbers as ample evidence of an intent to mislead;"

- "The SEC's chief evidence of Gann's intent to deceive was his use of numerous account and registration numbers that actually represented his (and Fasciano's) work for HCM. The SEC contended that Gann's efforts were meant to circumvent the funds' regulations for his own gain and that of his customer;" and

- "For the foregoing reasons, the judgment of the district court is AFFIRMED."

Gann also concealed his plan to trade on material nonpublic information.

72. Alattar also contends Friedlander (and Equity Highrise) and Gann (and his companies) aided and abetted by overtly assisting Casey in obtaining shares beneath the 10% restriction while in fact controlling much more. Friedlander also assisted Casey by, as shares were sold throughout 2012, misrepresenting the value of the shares by concealing what was known only to Friedlander and Casey, but not Alattar. Friedlander and Gann also concealed the fact that they were uniquely aware of inside information about the status of the issues (Top Gear and Luxeyard) each time Alattar was asked to

28

invest more in the company. Friedlander and Gann had actual and general awareness of their role in tricking Alattar into the SEA as well as the series A-D financing because they participated in many prior pump and dumps with Casey and other known criminals. When they acted, wrote, communicated and concealed material facts from Alattar, they did so with intent to deceive Alattar. All of these communications were to Alattar and/or they had a reason to expect the communications would be presented to Alattar. The above conduct substantially assisted Casey and the other insiders in facilitating the illegal pump and dump and in helping Casey avoid the restrictions placed on beneficial owners of greater than 10% on a company's outstanding shares. *See* 15 U.S.C. § 78p; 17 C.F.R. § 240.16a-1; 15 U.S.C. §78m(d)(3); Anslow Deposition at pp. 134, 226. They also assisted Casey in tricking Alattar (and others) into making subsequent investments. They also made misrepresentations in the representations and warranties they signed in the Subscription Agreement, including:

- "There is no Action pending against, or to the Knowledge of such Investor, threatened against or affecting, such Investor by any Governmental Authority or other Person with respect to such Investor that challenges, or may have the effect of preventing, delaying, making illegal, or otherwise interfering with, any of the transactions contemplated by this Agreement."

- "Such Investor is acquiring such the Securities proposed to be acquired hereunder for investment for its own account and not with a view to the resale or distribution of any part thereof, and such Investor has no present intention of selling or otherwise distributing such Securities, except in compliance with applicable securities Laws."

- "Such Investor further acknowledges that if the Securities are issued to such Investor in accordance with the provisions of this Agreement, such Securities may not be resold without registration under the Securities Act or the existence of an exemption therefrom."

- "Such Person will not sell or otherwise transfer the Securities, unless either (A) the transfer of such securities is registered under the Securities Act or (B) an exemption from registration of such securities is available."

29

- "Such Investor has not directly or indirectly, nor has any person acting on behalf of or pursuant to any understanding with such Investor, engaged in any transaction in the securities of the Company (including, without limitation, Short Sales involving the Company's securities) since the time that such Investor was first contacted by the Company regarding the investment in the Company contemplated herein."

73. In addition, Friedlander and Gann knowingly cashed the proceeds of the illegal enterprise. *U.S. v. Salmonese,* 352 F.3d 608 (2d Cir. 2010); *U.S. v. Loe*, 248 F.3d 449 (5th Cir. 2001); *U.S. v. Girard*, 744 F.2d 1170, 1171 (5th Cir. 1984). They also knowingly refused to provide documents and knowingly took positions in open court on the record that were the exact opposite of what their lawyer was told from the California bankruptcy lawyer hired to represent Casey and Gann. Finally, it was unlawful to trade stock on material nonpublic information and, a conspiracy may be based on lawful conduct through unlawful means. Their overt acts need not "be" the unlawful act or controlling fact. Conspiracy involves participation in a tort and does not require independent liability.

74. The above conduct was performed by assisting or encouraging; assisting or participating; or concert of action under Restatement (Second) of Torts §876, and each aider and abettor had actual knowledge of the conduct of the primary actor and its effects. Each aider and abettor substantially assisted the primary actor(s) by concealing material facts, artificially inflating trading volume through fake accounts, shorting the very stock they promoted, by trading on material nonpublic information, distributing secret free trading shares, and knowing cashing and retaining the ill gotten profits (which alone is a sufficient overt act to compose liability). *U.S. v. Salmonese,* 352 F.3d 608 (2d Cir. 2010); *U.S. v. Loe*, 248 F.3d 449 (5th Cir. 2001); *U.S. v. Girard*, 744 F.2d 1170, 1171 (5th Cir. 1984). Each aider and abettor also substantially assisted the primary

30

actor(s) by attempting to avoid "affiliate" status, concealing the background of the officers they hand picked, conspiring with A&J, engaging in a secret and self funded media blitz that contained misrepresentations, and selling all of their shares at a pre-determined time.

75. Hudson, Brompton and Allen had a meeting of the minds with the insiders including Casey, Friedlander, Trotter and Gann. Allen had a pre-existing relationship with those insiders and failed to disclose that relationship when he was introduced to LuxeYard. He pretended to be an objective and independent consultant to the company and entered into a consulting agreement. He did not disclose his prior relationship with the Defendants and he did not disclose that the consideration he received pursuant to his consulting agreement was actually immediately turned over to the Defendants. He therefore assisted them in accumulating more stock in LuxeYard. Further, Allen failed to disclose the imminent pump and dump of which he was aware given his prior relationship with the Defendants. He assisted the insiders in trading on inside information, allowing them to have increased beneficial ownership, and in advising the company pursuant to their instructions. Brompton (which included Hudson) acquired free trading shares without telling LuxeYard or Alattar. *See* 15 U.S.C. §78p; 17 C.F.R. § 240.16a-1; 15 U.S.C. §78m(d)(3); Anslow Deposition at pp. 134, 226. Brompton had a prior relationship with the Defendants and acquired free trading shares in previous pump and dumps. Brompton never disclosed this in any of the documents Brompton signed including the subscription agreement. Brompton had a meeting of the minds to sell its free trading shares on inside information it acquired from Casey, Friedlander, and Trotter. Brompton never disclosed this previous relationship to Alattar or LuxeYard and Brompton misrepresented its relationship to the company in the subscription

31

agreement. Brompton assisted Casey and his gang in that they "controlled" the shares held by Brompton for purposes of the definition of beneficial ownership. The unlawful acts that Brompton assisted in include insider trading, breach of fiduciary duty, fraud, and violation of the Texas Securities Act. This conduct also allowed Defendants to transfer stock under conditions that would have precluded them from disposing of their stock if Defendants had disclosed that they actually had beneficial ownership of the stock held by Brompton.

### *Conspiracy*

76.     Plaintiff incorporates all allegations contained in the foregoing paragraphs.

77.     Based on the authority contained within the opinion letters, the "unrestricted" shares were then divided among the Defendants and their co-conspirators. Some of these shares were hidden in nominee accounts or hidden under the names of different corporations in the Unites States and in offshore accounts in places such as Bermuda. These "Hiding" Companies included Lee Bear, Lazy Bear, Jinsun, Acadia Holdings, The Fishman Family Trust, Equity Highrise, Qvarex Commerce, Sano Holdings and Core Energy Resources among others.

78.     All Defendants (each and every Defendant including Sater and Acadia) had a meeting of the minds to defraud Alattar and breach fiduciary duties owed to Alattar by using his legitimate business as a front to perpetrate an overnight pump and dump scheme. One or more unlawful overt acts were committed by each of these Defendants, such as A&J's drafting of the fraudulent documents connected to the reverse merger transaction and A&J's assisting Casey in acquiring the controlling interest of Top Gear prior to the reverse merger. These Defendants conspired further to defraud Alattar into

32

believing that the nature of the transaction at issue was to assist LY in achieving continued growth by going public through a reverse merger and then go on to become a premier web-based company without disclosing that Defendants' actual intent was to use the shell company to perpetrate a pump and dump scheme. These Defendants, acting jointly and in concert, each engaged in unlawful acts in furtherance of their conspiracy, all as outlined above. Alattar has been injured as a result of defendant's conspiracy and seeks his actual damages.[6] By engaging in a conspiracy to commit fraud, Defendants are liable for exemplary damages.

79. Friedlander misrepresented and actively concealed his purported experience, his advertised skill set, the nature of the individuals with whom he would be working, that they were known criminals, his previous involvement with A&J, his opinions regarding Luxeyard's expected revenue, that he was involved in prior pump and dumps, that he participated in hand-picking employees who were advertised as strangers (when they were not) and more. Gann actively concealed the prior pump and dumps, that he was fined and penalized by the Fifth Circuit as follows:

- "The district court found Gann not credible and determined that he had violated Section 10(b) and Rule 10b-5;"

- "Gann and Fasciano opened 21 accounts for nine HCM affiliates, albeit the investors in each were the same;"

- "After receiving a block notice, Gann and Fasciano would switch the identifier number they were using, enabling them to continue trading, at least temporarily;"

---

[6] Gann and Friedlander and Casey controlled the day-to-day operations of the entities through which they perpetrated their fraud, breach of fiduciary duty, and stock fraud. Although they acted individually, they set up separate alter ego companies for purposes of hiding their trading activity. They are alter egos of the companies that acted as a mere conduit for purposes of individual participation in numerous torts-which torts damaged Plaintiff. The documents for these companies were sent directly to these Defendants and signed by them. For purposes of this allegation, Plaintiff refers to and incorporates Plaintiff's Motions to Compel as to those Defendants-which Motions attach ample evidence of control, alter ago, and sham to perpetuate a fraud.

33

- "The material misstatements at issue are Gann's use of different and varying client account numbers to disguise the frequency and magnitude of HCM's trading in the various funds;"

- "The district court held that Gann's practice of switching identifying broker and client account numbers constituted materially misleading statements in violation of the securities laws;"

- "The SEC's proof that Gann's use of different numbers to conduct his trades demonstrated that he did not want the fund companies catching on this his trading practices;"

- "In one instance, Fasciano traded a Goldman Sachs fund three times and received a block notice, yet he and Gann placed five more trades under a difference number, received two more block notices, and still continued placing trades;"

- "We view the SEC's characterization of the use of multiple registration and account numbers as ample evidence of an intent to mislead;"

- "The SEC's chief evidence of Gann's intent to deceive was his use of numerous account and registration numbers that actually represented his (and Fasciano's) work for HCM.  The SEC contended that Gann's efforts were meant to circumvent the funds' regulations for his own gain and that of his customer;" and

- "For the foregoing reasons, the judgment of the district court is AFFIRMED."

Gann also concealed his plan to trade on material nonpublic information.

80.     Alattar also contends Friedlander (and Equity Highrise) and Gann (and his companies) aided and abetted by overtly assisting Casey in obtaining shares beneath the 10% restriction while in fact controlling much more.  Friedlander also assisted Casey by, as shares were sold throughout 2012, misrepresenting the value of the shares by concealing what was known only to Friedlander and Casey, but not Alattar.  Friedlander and Gann also concealed the fact that they were uniquely aware of inside information about the status of the issues (Top Gear and Luxeyard) each time Alattar was asked to invest more in the company.  Friedlander and Gann had actual and general awareness of their role in tricking Alattar into the SEA as well as the series A-D financing because

34

they participated in many prior pump and dumps with Casey and other known criminals. When they acted, wrote, communicated and concealed material facts from Alattar, they did so with intent to deceive Alattar. All of these communications were to Alattar and/or they had a reason to expect the communications would be presented to Alattar. The above conduct substantially assisted Casey and the other insiders in facilitating the illegal pump and dump and in helping Casey avoid the restrictions placed on beneficial owners of greater than 10% on a company's outstanding shares. *See* 15 U.S.C. § 78p; 17 C.F.R. § 240.16a-1; 15 U.S.C. §78m(d)(3); Anslow Deposition at pp. 134, 226. They also assisted Casey in tricking Alattar (and others) into making subsequent investments. They also made misrepresentations in the representations and warranties they signed in the Subscription Agreement, including:

- "There is no Action pending against, or to the Knowledge of such Investor, threatened against or affecting, such Investor by any Governmental Authority or other Person with respect to such Investor that challenges, or may have the effect of preventing, delaying, making illegal, or otherwise interfering with, any of the transactions contemplated by this Agreement."

- "Such Investor is acquiring such the Securities proposed to be acquired hereunder for investment for its own account and not with a view to the resale or distribution of any part thereof, and such Investor has no present intention of selling or otherwise distributing such Securities, except in compliance with applicable securities Laws."

- "Such Investor further acknowledges that if the Securities are issued to such Investor in accordance with the provisions of this Agreement, such Securities may not be resold without registration under the Securities Act or the existence of an exemption therefrom."

- "Such Person will not sell or otherwise transfer the Securities, unless either (A) the transfer of such securities is registered under the Securities Act or (B) an exemption from registration of such securities is available."

- "Such Investor has not directly or indirectly, nor has any person acting on behalf of or pursuant to any understanding with such Investor, engaged in any transaction in the securities of the Company (including, without limitation, Short

35

Sales involving the Company's securities) since the time that such Investor was first contacted by the Company regarding the investment in the Company contemplated herein."

81.    In addition, Friedlander and Gann knowingly cashed the proceeds of the illegal enterprise. *U.S. v. Salmonese,* 352 F.3d 608 (2d Cir. 2010); *U.S. v. Loe*, 248 F.3d 449 (5ᵗʰ Cir. 2001); *U.S. v. Girard*, 744 F.2d 1170, 1171 (5ᵗʰ Cir. 1984). They also knowingly refused to provide documents and knowingly took positions in open court on the record that were the exact opposite of what their lawyer was told from the California bankruptcy lawyer hired to represent Casey and Gann.  Finally, it was unlawful to trade stock on material nonpublic information and, a conspiracy may be based on lawful conduct through unlawful means.  Their overt acts need not "be" the unlawful act or controlling fact.  Conspiracy involves participation in a tort and does not require independent liability.

82.    The above conduct was performed by assisting or encouraging; assisting or participating; or concert of action under Restatement (Second) of Torts §876, and each aider and abettor had actual knowledge of the conduct of the primary actor and its effects.  Each aider and abettor (each Defendant) substantially assisted the primary actor(s) by concealing material facts, providing brokerage and underwriting services in connection with the purchase of the shell company with knowledge of the intent to use the shell company in the pump and dump scheme, providing the majority of capital needed to purchase the shell company, artificially inflating trading volume through fake accounts, shorting the very stock they promoted, trading on material nonpublic information, distributing secret free trading shares, coordinating the timing of their trades to maximize their profits when they dumped their shares, and knowingly cashing and retaining the ill gotten profits (which alone is a sufficient overt act to compose

liability). *U.S. v. Salmonese,* 352 F.3d 608 (2d Cir. 2010); *U.S. v. Loe*, 248 F.3d 449 (5th Cir. 2001); *U.S. v. Girard*, 744 F.2d 1170, 1171 (5th Cir. 1984). The Defendants acted in concert, both amongst themselves and with others, to control and dominate the market in LuxeYard stock, engage in coordinated trading activity (including the use of matched orders, wash trades, and "gypsy swaps"), and funded and arranged for the creation and distribution of false promotional materials to the public to generate a false appearance of liquidity and investor interest in LuxeYard stock, thereby artificially inflating the trading volume and share price. The Defendants also conspired to use nominee brokerage and bank accounts in the names of corporate entities, trusts, relatives, and acquaintances to conceal their fraudulent activity. So, each Defendant has illegally retained the proceeds despite knowledge of the fraudulent scheme. Each aider and abettor (each Defendant) also substantially assisted the primary actor(s) by attempting to avoid "affiliate" status, concealing the background of the officers they hand picked, conspiring with A&J, engaging in a secret and self funded media blitz that contained misrepresentations, and selling all of their shares at a pre-determined time. All Defendants had, by definition, and by admission, a meeting of the minds with the companies they control.

83. Hudson, Brompton and Allen had a meeting of the minds with the insiders including Casey, Friedlander, Trotter and Gann. Allen had a pre-existing relationship with those insiders and failed to disclose that relationship when he was introduced to LuxeYard. He pretended to be an objective and independent consultant to the company and entered into a consulting agreement. He did not disclose his prior relationship with the Defendants and he did not disclose that the consideration he received pursuant to his consulting agreement was actually immediately turned over to the Defendants. He

therefore assisted them in accumulating more stock in LuxeYard. Further, Allen failed to disclose the imminent pump and dump of which he was aware given his prior relationship with the Defendants. He assisted the insiders in trading on inside information, allowing them to have increased beneficial ownership, and in advising the company pursuant to their instructions. Brompton (which included Hudson) acquired free trading shares in return for its involvement in the pump and dump scheme without telling LuxeYard or Alattar. *See* 15 U.S.C. §78p; 17 C.F.R. § 240.16a-1; 15 U.S.C. §78m(d)(3); Anslow Deposition at pp. 134, 226. Brompton had a prior relationship with the Defendants and acquired free trading shares in previous pump and dumps. Brompton never disclosed this in any of the documents Brompton signed including the subscription agreement. Brompton had a meeting of the minds to sell its free trading shares on inside information it acquired from Casey, Friedlander, and Trotter. Brompton never disclosed this previous relationship to Alattar or LuxeYard and Brompton misrepresented its relationship to the company in the subscription agreement. Brompton assisted Casey and his gang in that they "controlled" the shares held by Brompton for purposes of the definition of beneficial ownership. The unlawful acts that Brompton assisted in include insider trading, breach of fiduciary duty, fraud, and violation of the Texas Securities Act. This conduct also allowed Defendants to transfer stock under conditions that would have precluded them from disposing of their stock if Defendants had disclosed that they actually had beneficial ownership of the stock held by Brompton. Doug Shaw and Trevor Ling also conspired with the other Defendants, and acted as agents of Brompton in this conspiracy.

84. Additionally, Jeff Lamont, Jeffrey Sater, Joseph Lee, Kay Holdings, Lance Baral, Thomas Hudson, and William Bartlett also made nominal interim investments in

38

the company to help fund operations so that the rest of the pump and dump scheme could be executed.

85.     Additionally, the Defendants concealed their funding of unauthorized marketing and promotion of LuxeYard stock by selling blocks of stock amongst themselves through matched orders in the open market. The Defendants used proceeds from these block trades to fund sham marketing of LuxeYard, by Next Media and disgraced television and radio personality Tobin Smith, with money laundered through their illegal coordinated trading activities.

### *Aiding and Abetting*

86.     Plaintiff incorporates all allegations contained in the foregoing paragraphs.

87.     Defendants, individually and as a group (each and every Defendant including Sater and Acadia), assisted or encouraged each other, assisted and participated with each other, and also acted in concert of action. Under Texas law, such group participation constitutes aiding and abetting and warrants the imposition of joint liability even if the Plaintiff dealt primarily with a single defendant. Stated another way, when a defendant provides assistance or encouragement to another person who commits a tort, and the aiding or encouragement is a substantial factor in causing the tort, then the defendant is considered a tortfeasor, and consequently, is liable for the consequences of the tort. In this case, Defendants aided and abetted each other and others unnamed in committing the torts enumerated above. Hence, joint and several liability is appropriate.

88.     Friedlander misrepresented and actively concealed his purported experience, his advertised skill set, the nature of the individuals with whom he would be

working, that they were known criminals, his previous involvement with A&J, his opinions regarding Luxeyard's expected revenue, that he was involved in prior pump and dumps, that he participated in hand-picking employees who were advertised as strangers (when they were not) and more. Gann actively concealed the prior pump and dumps, that he was fined and penalized by the Fifth Circuit as follows:

- "The district court found Gann not credible and determined that he had violated Section 10(b) and Rule 10b-5;"

- "Gann and Fasciano opened 21 accounts for nine HCM affiliates, albeit the investors in each were the same;"

- "After receiving a block notice, Gann and Fasciano would switch the identifier number they were using, enabling them to continue trading, at least temporarily;"

- "The material misstatements at issue are Gann's use of different and varying client account numbers to disguise the frequency and magnitude of HCM's trading in the various funds;"

- "The district court held that Gann's practice of switching identifying broker and client account numbers constituted materially misleading statements in violation of the securities laws;"

- "The SEC's proof that Gann's use of different numbers to conduct his trades demonstrated that he did not want the fund companies catching on this his trading practices;"

- "In one instance, Fasciano traded a Goldman Sachs fund three times and received a block notice, yet he and Gann placed five more trades under a difference number, received two more block notices, and still continued placing trades;"

- "We view the SEC's characterization of the use of multiple registration and account numbers as ample evidence of an intent to mislead;"

- "The SEC's chief evidence of Gann's intent to deceive was his use of numerous account and registration numbers that actually represented his (and Fasciano's) work for HCM. The SEC contended that Gann's efforts were meant to circumvent the funds' regulations for his own gain and that of his customer;" and

- "For the foregoing reasons, the judgment of the district court is AFFIRMED."

40

Gann also concealed his plan to trade on material nonpublic information.

89.    Alattar also contends Friedlander (and Equity Highrise) and Gann (and his companies) aided and abetted by overtly assisting Casey in obtaining shares beneath the 10% restriction while in fact controlling much more.  Friedlander also assisted Casey by, as shares were sold throughout 2012, misrepresenting the value of the shares by concealing what was known only to Friedlander and Casey, but not Alattar.  Friedlander and Gann also concealed the fact that they were  uniquely aware of inside information about the status of the issues (Top Gear and Luxeyard) each time Alattar was asked to invest more in the company.  Friedlander and Gann had actual and general awareness of their role in tricking Alattar into the SEA as well as the series A-D financing because they participated in many prior pump and dumps with Casey and other known criminals.  When they acted, wrote, communicated and concealed material facts from Alattar, they did so with intent to deceive Alattar.  All of these communications were to Alattar and/or they had a reason to expect the communications would be presented to Alattar.  The above conduct substantially assisted Casey and the other insiders in facilitating the illegal pump and dump and in helping Casey avoid the restrictions placed on beneficial owners of greater than 10% on a company's outstanding shares. *See* 15 U.S.C. § 78p; 17 C.F.R. § 240.16a-1; 15 U.S.C. §78m(d)(3); Anslow Deposition at pp. 134, 226.  They also assisted Casey in tricking Alattar (and others) into making subsequent investments.  They also made misrepresentations in the representations and warranties they signed in the Subscription Agreement, including:

- "There is no Action pending against, or to the Knowledge of such Investor, threatened against or affecting, such Investor by any Governmental Authority or other Person with respect to such Investor that challenges, or may have the effect of preventing, delaying, making illegal, or otherwise interfering with, any of the transactions contemplated by this Agreement."

41

- "Such Investor is acquiring such the Securities proposed to be acquired hereunder for investment for its own account and not with a view to the resale or distribution of any part thereof, and such Investor has no present intention of selling or otherwise distributing such Securities, except in compliance with applicable securities Laws."

- "Such Investor further acknowledges that if the Securities are issued to such Investor in accordance with the provisions of this Agreement, such Securities may not be resold without registration under the Securities Act or the existence of an exemption therefrom."

- "Such Person will not sell or otherwise transfer the Securities, unless either (A) the transfer of such securities is registered under the Securities Act or (B) an exemption from registration of such securities is available."

- "Such Investor has not directly or indirectly, nor has any person acting on behalf of or pursuant to any understanding with such Investor, engaged in any transaction in the securities of the Company (including, without limitation, Short Sales involving the Company's securities) since the time that such Investor was first contacted by the Company regarding the investment in the Company contemplated herein."

90. In addition, Friedlander and Gann knowingly cashed the proceeds of the illegal enterprise. *U.S. v. Salmonese,* 352 F.3d 608 (2d Cir. 2010); *U.S. v. Loe*, 248 F.3d 449 (5th Cir. 2001); *U.S. v. Girard*, 744 F.2d 1170, 1171 (5th Cir. 1984). They also knowingly refused to provide documents and knowingly took positions in open court on the record that were the exact opposite of what their lawyer was told from the California bankruptcy lawyer hired to represent Casey and Gann. Finally, it was unlawful to trade stock on material nonpublic information and, a conspiracy may be based on lawful conduct through unlawful means. Each Defendant, including Sater, traded on inside information and based on instruction from the insiders. Their overt acts need not "be" the unlawful act or controlling fact. Conspiracy involves participation in a tort and does not require independent liability.

42

91.     The above conduct was performed by assisting or encouraging; assisting or participating; or concert of action under Restatement (Second) of Torts §876, and each aider and abettor had actual knowledge of the conduct of the primary actor and its effects. Each aider and abettor (each Defendant) substantially assisted the primary actor(s) by concealing material facts, providing brokerage and underwriting services in connection with the purchase of the shell company with knowledge of the intent to use the shell company in the pump and dump scheme, providing the majority of capital needed to purchase the shell company, artificially inflating trading volume through fake accounts, shorting the very stock they promoted, trading on material nonpublic information, distributing secret free trading shares, coordinating the timing of their trades to maximize their profits when they dumped their shares, and knowingly cashing and retaining the ill gotten profits (which alone is a sufficient overt act to compose liability). *U.S. v. Salmonese,* 352 F.3d 608 (2d Cir. 2010); *U.S. v. Loe*, 248 F.3d 449 (5th Cir. 2001); *U.S. v. Girard*, 744 F.2d 1170, 1171 (5th Cir. 1984). The Defendants acted in concert, both amongst themselves and with others, to control and dominate the market in LuxeYard stock, engage in coordinated trading activity (including the use of matched orders, wash trades, and "gypsy swaps"), funded and arranged for the creation and distribution of false promotional materials to the public to generate a false appearance of liquidity and investor interest in LuxeYard stock, thereby artificially inflating the trading volume and share price. The Defendants also conspired to use nominee brokerage and bank accounts in the names of corporate entities, trusts, relatives, and acquaintances to conceal their fraudulent activity. Each aider and abettor also substantially assisted the primary actor(s) by attempting to avoid "affiliate" status, concealing the background of the officers they hand picked, conspiring with A&J,

43

engaging in a secret and self funded media blitz that contained misrepresentations, and selling all of their shares at a pre-determined time. All Defendants, by definition aided and abetted the companies they control. Accordingly, Defendant Jeff Sater also traded on material non-public information by selling based on instructions from the insiders.

92. Hudson, Brompton and Allen had a meeting of the minds with the insiders including Casey, Friedlander, Trotter and Gann. Allen had a pre-existing relationship with those insiders and failed to disclose that relationship when he was introduced to LuxeYard. He pretended to be an objective and independent consultant to the company and entered into a consulting agreement. He did not disclose his prior relationship with the Defendants and he did not disclose that the consideration he received pursuant to his consulting agreement was actually immediately turned over to the Defendants. He therefore assisted them in accumulating more stock in LuxeYard. Further, Allen failed to disclose the imminent pump and dump of which he was aware given his prior relationship with the Defendants. He assisted the insiders in trading on inside information, allowing them to have increased beneficial ownership, and in advising the company pursuant to their instructions. Brompton (which included Hudson) acquired free trading shares in return for its involvement in the pump and dump scheme without telling LuxeYard or Alattar. *See* 15 U.S.C. §78p; 17 C.F.R. § 240.16a-1; 15 U.S.C. §78m(d)(3); Anslow Deposition at pp. 134, 226. Brompton had a prior relationship with the Defendants and acquired free trading shares in previous pump and dumps. Brompton never disclosed this in any of the documents Brompton signed including the subscription agreement. Brompton had a meeting of the minds to sell its free trading shares on inside information it acquired from Casey, Friedlander, and Trotter. Brompton never disclosed this previous relationship to Alattar or LuxeYard and

44

Brompton misrepresented its relationship to the company in the subscription agreement. Brompton assisted Casey and his gang in that they "controlled" the shares held by Brompton for purposes of the definition of beneficial ownership. The unlawful acts that Brompton assisted in include insider trading, breach of fiduciary duty, fraud, and violation of the Texas Securities Act. This conduct also allowed Defendants to transfer stock under conditions that would have precluded them from disposing of their stock if Defendants had disclosed that they actually had beneficial ownership of the stock held by Brompton. Doug Shaw and Trevor Ling also assisted the other Defendants, and acted as agents of Brompton in assisting the primary actor(s) in the scheme described herein.

93. Additionally, Jeff Lamont, Jeffrey Sater, Joseph Lee, Kay Holdings, Lance Baral, Thomas Hudson, and William Bartlett also made nominal interim investments in the company to help fund operations so that the rest of the pump and dump scheme could be executed.

94. Additionally, the Defendants concealed their funding of unauthorized marketing and promotion of LuxeYard stock by selling blocks of stock amongst themselves through matched orders in the open market. The Defendants used proceeds from these block trades to fund sham marketing of LuxeYard, by Next Media and disgraced television and radio personality Tobin Smith, with money laundered through their illegal coordinated trading activities.

### *Unjust Enrichment against Casey, Jinsun, Friedlander, Gann, Camarillo and The Jonathan Camarillo Trust and each of the companies they control*

95. Plaintiff incorporates all allegations contained in the foregoing paragraphs.

45

96.     Alattar seeks the equitable remedy of unjust enrichment against A&J, Casey, Friedlander, Gann, Camarillo and The Jonathan Camarillo Trust because they all obtained a benefit from Plaintiff directly and/or indirectly. *See City of Corpus v. S.S. Smith & Sons Masonry, Inc.*, 736 S.W.2d 247, 250 (Tex. App.—Corpus Christi 1987, writ denied) (holding a defendant is liable for unjust enrichment if it secured a benefit, or passively received one, which would be unconscionable to retain). When a person obtains a benefit from another by fraud, duress, or the taking of undue advantage, the aggrieved party may sue to prevent unjust enrichment.  To prevent unjust enrichment and to deter others from violating securities laws and fiduciary duties, a court has broad powers to order a defendant to disgorge all illicit gains and impose a judgment in trust on those gains.   Further, where two or more individuals or entities have a close relationship and engage in conduct giving rise to unjust enrichment, the perpetrators may be held jointly and severally liable for the disgorgement of illegally obtained proceeds.  Casey, for himself and through affiliates, obtained a benefit from Plaintiff who hired him, trusted him, and sold his company to him, which totaled approximately $30,000,000 in profits as a direct result of fraud and taking undue advantage of Alattar by using his legitimate business as a front for a pump and dump scheme.  Accordingly, Alattar seeks disgorgement of all ill-gotten profits under the doctrine of unjust enrichment.

97.     As outlined above, A&J, Casey, Friedlander, Gann, Camarillo and The Jonathan Camarillo Trust obtained shares of Top Gear stock from Alattar by taking undue advantage of Alattar and placing Alattar under duress as explained above.  They specifically obtained money from Alattar.  They specifically obtained his interest in LY. These Defendants are liable for rescission of all ill-gotten LUXR shares under the

46

doctrine of unjust enrichment. Alattar has an independent claim for unjust enrichment because he was lied to as an individual, for months. He was, alone, a party to the Security Exchange Agreement. Disgorgement is appropriate where there is unjust enrichment. Moreover had Casey told the truth, then Alattar would have sold his stock when Casey did and Alattar would have made millions as well. The $30,000,000 is the amount to which Casey and the other insiders were unjustly enriched. They also obtained a company that they could then take public.

### *Money Had and Received against Casey, Jinsun, Top Gear, Friedlander, Gann, Camarillo and The Jonathan Camarillo Trust and each of the companies they control*

98. Plaintiff incorporates all allegations contained in the foregoing paragraphs.

99. Alattar seeks the equitable remedy of money had and received against Casey, Gann, Friedlander and the above named Defendants. Casey and his unnamed co-conspirators, earned approximately $30,000,000 in profits resulting from their pump and dump scheme that in equity and good conscience belongs in part to Alattar. Therefore, Alattar seeks forfeiture of all ill-gotten profits received by them in connection with the pump and dump scheme.

100. Alattar seeks the equitable remedy of money had and received against Top Gear, Friedlander and Gann. Top Gear, Friedlander and Gann received substantial consideration for assisting Casey in avoiding liability for the pump and dump scheme by signing a release and waiver of claims against Casey. In equity and good conscience, the consideration received belongs to Alattar. Therefore, Alattar seeks forfeiture of all consideration received by Top Gear, Friedlander, Gann, Camarillo and The Jonathan Camarillo Trust in exchange for their execution of the release and waiver.

47

### *Constructive Trust against Casey, Jinsun, Top Gear, Friedlander, Gann, Camarillo and The Jonathan Camarillo Trust*

101. Plaintiff incorporates all allegations contained in the foregoing paragraphs.

102. Alattar is entitled to the equitable remedy of constructive trust with respect to Casey, Friedlander, and Gann (and their companies) because of their perpetration of the pump and dump scheme as outlined above. Casey, Friedlander, and Gann committed actual fraud as described above in connection with the reverse merger transaction and promises to build a viable business venture. This actual fraud has resulted in unjust enrichment to Casey and his affiliates in the form of approximately $30,000,000 in ill-gotten profits. Alattar seeks the remedy of constructive trust in the amount of all ill-gotten profits resulting from the pump and dump scheme.

103. Finally, Alattar seeks the equitable remedy of constructive trust against Friedlander, Gann, Camarillo and The Jonathan Camarillo Trust as a result of their concerted efforts to assist Casey.

### *Negligence*

104. Plaintiff incorporates all allegations contained in the foregoing paragraphs.

105. Defendants conspired with A&J who owed a duty of care to Alattar, but breached that duty by representing the shell company in the primary transaction, affirmatively assisting Casey and his team in what A&J admits was pump and dump, submitting fraudulent letters to the transfer agent to facilitate the transfer of free

48

trading stock, making affirmative misrepresentations of material fact regarding Casey's affiliate status, failing to tell Alattar that A&J was revising documents after their effective date, failing to honor the terms in the Term Sheet provided to A&J, assisting Casey and his team in obtaining secret control of the shell prior to the reverse merger, failing to disclose its relationship with Casey, and in refusing to disclose that articles on the internet allege A&J is connected to a long list of shell pump and dumps. Casey and Friedlander also made negligent misrepresentations.

### *Exemplary Damages*

106. Plaintiff incorporates all allegations contained in the foregoing paragraphs.

107. The actions of Casey, Top Gear, Friedlander, Gann, Camarillo and The Jonathan Camarillo Trust and all of the companies they control surrounding the reverse merger transaction constitute fraud, malice and/or gross negligence. The actions of Casey and A&J in inducing Alattar to transfer large blocks of LUXR shares constitute fraud, malice and/or gross negligence. The actions of Casey and A&J surrounding the offer and acceptance of the release and waiver similarly constitute fraud, malice, and/or gross negligence. All Defendants (each and every Defendant including Sater) engaged in a conspiracy to commit fraud and all acted with malice and gross negligence. Each Defendant, including Sater, traded on material inside information. Alattar therefore seeks exemplary damages against all Defendants pursuant to Chapter 41 of the Texas Civil Practice & Remedies Code.

108. In addition to exemplary damages, Alattar seeks to remove the cap on exemplary damages pursuant to Section 41.008(c) of the Texas Civil Practice and Remedies Code. Casey, Friedlander, and each of their companies engaged in conduct

49

that was knowing and intentional, as well as a felony, surrounding the signing of the release and waiver agreement constitute commercial bribery in violation of Section 32.43 of the Texas Penal Code. A&J and Casey's actions surrounding the reverse merger transaction constitute the securing of a document by deception in violation of Section 32.46 of the Texas Penal Code. These actions were knowing and intentional and constituted a felony. They also knowing and intentionally secured the execution of the Term Sheet through fraud and deception. They also intentionally and knowingly secured the execution of the shareholder signature indemnity through fraud and deception. They also knowingly and intentionally forged that document. They also knowingly and intentionally forged the names of the 42 Israeli shareholders who provided Top Gear to them. Therefore, there is no cap on exemplary damages under the Texas Civil Practice & Remedies Code Section 41.008(c).

109. Casey bribed Luxeyard and LY to settle LY's claims against Casey and the gang by Luxeyard to. Casey bribed Mireskandari in the same manner and so as to obtain a release from Luxeyard. Casey bribed Braden Richter and Tommy Allen by giving them, the company business consultants, substantial stock in Luxeyard so that Casey could control Luxeyard through them. In these instances, Casey acted without the consent of Plaintiff or Luxeyard. Casey was a fiduciary to LY, to Plaintiff and to Luxeyard, and so was Mr. Richter and Mr. Allen. Tex. Penal Code §32.43(a). In these instances, Casey offered, conferred, or agreed to confer a benefit upon a fiduciary without the consent of fiduciary's beneficiary, Plaintiff, Luxeyard and LY. Tex. Penal Code §32.43(c). The offers and agreements to confer by Casey to Mireskandari, Mr. Richter and Mr. Allen were designed to influence their conduct. Tex. Penal Code §32.43(b).

50

***Fraudulent Transfer under Texas Uniform Fraudulent Transfer Act against Casey, Friedlander, Gann and the companies they control***

110. Plaintiff incorporates all allegations contained in the foregoing paragraphs.

111. These Defendants, and their unnamed co-conspirators, earned approximately $30,000,000 in profits resulting from their pump and dump scheme that in equity and good conscience belongs in part to Alattar. Alattar does not seek these as damages to LuxeYard but pursuant to equitable disgorgement. Alattar is a creditor who has a claim against these Defendants for purposes of Texas Business and Commerce Code, Section 24.002, et seq. As stated in the above paragraphs, Defendants have engaged in a series and scheme of fraudulent transfers in violation of Texas Business and Commerce Code, Section 24.005, et seq. Plaintiff seeks all remedies and damages as otherwise stated in this petition, as well as those afforded to Plaintiff under the provisions of this statute, including injunctive relief.

## DAMAGES

112. Plaintiff incorporates all allegations contained in the foregoing paragraphs.

113. Alattar seeks actual damages, exemplary damages, exemplary damages in excess of the statutory limitation, treble damages, disgorgement of profits, attorney's fees, expert witness fees, costs for copies and depositions, court costs, pre-judgment interest, and post-judgment interest. Plaintiff's references to the decline in the stock price are not to establish direct damages. They are relevant to demonstrate a lost business opportunity, which opportunity was lost long after the decline. They are one of many variables in an indirect measure of a business valuation for LY Retail, and what

51

Plaintiff could have achieved had he never done business with Casey. They also reveal a "routine practice" and fraudulent intent. Plaintiff does not invoke the internal affairs doctrine. Plaintiff sues under Section 101.463(c). Plaintiff separately sues in his individual capacity in connection to the lies made to him individually. Plaintiff's right to sue was recognized by Casey in writing. Plaintiff withdraws his request for a trial by jury.

114. Alattar is suing Defendants for claims that accrued to him individually prior to or on November 8, 2011. Alattar does not ask this Court to construe the internal affairs of LuxeYard. That Alattar has damages that relate to how L.Y. Retail, a Texas company, would have performed, long after any decline in stock price, but for the fraud, is not a request by Alattar to construe the internal rights and powers of LuxeYard's shareholders. Nor is it a direct measure of damages.

115. So that there is no confusion, Defendants knowingly conspired to defraud Plaintiff at the time of the reverse merger and to induce him into the reverse merger, denying him of the lost business opportunity which continued long after the decline in the stock price, he would have enjoyed had Defendants either fulfilled their promises or allowed Plaintiff to **do business with someone else**. Alattar does not seek damages as a shareholder of LuxeYard.

## REQUEST FOR RELIEF

116. Alattar requests that Defendants be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for Alattar against Defendants for an amount to be determined at trial, plus attorneys' fees, court costs, and pre- and post-judgment interest at the maximum rate permitted by law, and such other and further relief to which Alattar may be entitled. The maximum amount of damages

52

sought against Defendants is still being determined. Plaintiff has yet to receive documents and discovery sufficient to calculate profits. Currently, the maximum amount of damages is that set forth in the testimony of Kevan Casey and Jonathan Friedlander in the amount of $150 million, which testimony is an indirect measure of damages to Plaintiff had Plaintiff never done business with Casey.

Respectfully submitted,

**FAUBUS KELLER & BURFORD LLP**

By: _/s/  Brian M. Keller_
        Brian M. Keller
        State Bar No. 00784376
        Mark Ritchie
        State Bar No. 24002845

1001 Texas Avenue, 11th Floor
Houston, Texas 77002
(713) 222-6400
(713) 222-7240 – Fax
brian@fkblawfirm.com
mark@fkblawfirm.com

***Attorneys for Plaintiff Khaled Alattar***

## CERTIFICATE OF SERVICE

A copy of this document was served electronically on all counsel of record on May 22, 2015, as follows:

David R. Clouston
Leslye Moseley
Sessions Fishman Nathan & Israel LLC
900 Jackson Street, Suite 440
Dallas, Texas 75202
(214) 741-3024 – office
(214) 741-3055 – facsimile
dclouston@sessions-law.biz
lmoseley@sessions-law.biz
*Attorneys for Jonathan Friedlander, Equity Highrise, Inc., Scott Gann, Lazy Bear LLC, Lee Bear LLC, Sun Bear LLC, OSO Capital LLC and Joseph Lee*

Jason Hopkins
Jason Lewis
Adam S. Tyler
Greenberg Traurig, LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
(214) 665-3660 - office
(214) 665-5960 - facsimile
hopkinsjm@gtlaw.com
lewisjs@gtlaw.com
tylera@gtlaw.com
*Attorneys for Kevan Casey, Jinsun LLC and Far East Strategies LLC*

Danny Sheena
The Sheena Law Firm
2500 West Loop South, Suite 518
Houston, Texas 77027
(713) 224-6508 – office
(713) 225-1560 – facsimile
danny@sheenalawfirm.com
jason@sheenalawfirm.com
cristina@sheenalawfirm.com
*Attorney for TOP GEAR, INC. n/k/a LUXEYARD, INC.*

Mark S. Hellinger
The Hellinger Law Firm
12 Greenway Plaza, Suite 1100
Houston, Texas 77046
(713) 623-1153 – office
(713) 623-1221 – facsimile
mhellinger@hellingerlawfirm.com
*Attorney for Jonathan Camarillo and The Jonathan Camarillo Trust*

J. Randle Henderson
16506 FM 529, Suite 115-107
Houston, Texas 77095
(713) 870-8358 – office
(281) 758-0545 – facsimile
jrh@hendersonrandy.com
*Attorney for Sano Holdings, Inc., Kay Holdings, Inc., William W. Bartlett, Jr.,
Kevin Lisman, Thomas Hudson, The Brompton Group NA, LLC, Jeff Lamont
Robert Klinek, Susan Pack, Lance Baral, Lawrence Isen and the Isen Trust*

Kevin T. Kennedy
4550 Post Oak Place, Suite 210
Houston, Texas 77027
(713) 862-3000 – office
(713) 979-2003 - facsimile
k.t.p.kennedy@gmail.com
*Attorney for Babak Daghighi*

Charley Davidson
Anthony L. Laporte
Hanszen Laporte, LLP
11767 Katy Freeway, Suite 850
Houston, Texas 77079
(713) 522-9444 – office
(713) 524-2580 – facsimile
cdavidson@hanszenlaporte.com
alaporte@hanszenlaporte.com
*Attorneys for Mark Trotter*

Jonathan D. Neerman
Seth Johnson
Jackson Walker L.L.P.
901 Main Street, Suite 6000
Dallas, Texas  75202
(214) 661-6899
jneerman@jw.com
jsjohnson@jw.com
*Attorneys for Apex Clearing Corporation*

55

Arthur Gollwitzer, III
Michael Best & Friedrich LLP
12600 Hill Country Blvd., R-275
Austin, Texas 78738
(512) 329-2676 – office
(512) 222-0818 – facsimile
agollwitzer@michaelbest.com
*Attorney for Wilson-Davis & Co.*

Blaire Bruns Johnson
James Chambers
Edison, McDowell & Hetherington LLP
3200 Southwest Freeway, Suite 2100
Houston, Texas 77027
(713) 337-5580 – office
(713) 337-8850 – facsimile
blaire.johnson@emhllp.com
james.chambers@emhllp.com
*Attorneys for Acadia Holding Corporation*

**U.S. Certified Mail, Return
    Receipt Requested No. 70111570000101620905**
**Regular U.S. First Class Mail**
Tommy Allen
631 Cypresswood Ln.
Spring, Texas 77373
tallen2112@yahoo.com
*Defendant, Pro se*

/s/ *Brian M. Keller*
Brian M. Keller

# TAB C

## CAUSE NO. 2012-54501

| | | |
|---|---|---|
| KHALED ALATTAR, | § | IN THE DISTRICT COURT OF |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| KEVAN CASEY, ET AL., | § | |
| | § | |
| **Defendants.** | § | 113ᵗʰ JUDICIAL DISTRICT |

### PLAINTIFF'S MOTION TO QUASH DEPOSITION OF WAYNE DOLCEFINO AND MOTION FOR PROTECTIVE ORDER

Plaintiff Khaled Alattar files this Motion to Quash Deposition of Wayne Dolcefino and Motion for Protective Order, and would respectfully show the Court as follows:

### INTRODUCTION

On June 17, 2015, Defendant Jinsun LLC ("Jinsun") filed and served Jinsun LLC's First Amended Notice of Deposition Subpoena Duces Tecum of Wayne Dolcefino, a true and correct copy of which is attached hereto as Exhibit A.[1] Based on the documents listed in the subpoena duces tecum, it is readily apparent that Jinsun (and thus, in reality, Kevan Casey) is attempting to force Mr. Dolcefino to reveal information he has compiled as a journalist. Mr. Dolcefino has been working on an investigative piece on Defendants' participation in the LuxeYard pump and dump and similar schemes, as established by his affidavit attached hereto as Exhibit B.

---

[1] The certificate of service erroneously states that the deposition notice and subpoena duces tecum was served on all counsel of record on June 16, 2015. As evidenced by the file stamped copy, the notice and subpoena was actually served through the e-filing system on June 17, 2015.

## MOTION TO QUASH

Pursuant to Texas Rule of Civil Procedure 199.4, Plaintiff hereby objects to the time and place designated for Mr. Dolcefino's deposition, on grounds that counsel for Plaintiff has a hearing scheduled in another proceeding on the date designated in the deposition and will be unavailable to attend. As this objection is made within three days after service of the notice, this deposition is stayed until Plaintiff's motion can be determined.

## MOTION FOR PROTECTIVE ORDER

"[A]ny … person affected by [a] discovery request" may seek a protective order regarding the discovery sought. Tex. R. Civ. P. 192.6(a). In ruling on the party's motion for protective order, the court "may make any order in the interest of justice" to protect the moving party "from undue burden, unnecessary expense, harassment, annoyance, or invasion of personal, constitutional, or property rights." *Id*. 192.6(b).

Jinsun's notice of deposition and subpoena duces tecum directed to Mr. Dolcefino does not constitute discovery of a matter that is "relevant to the subject matter of the pending action," nor is it "reasonably calculated to lead to the discovery of admissible evidence," as required under Texas Rule of Civil Procedure 192.3. Indeed, several categories of documents listed in the subpoena are on their face unrelated to discovering facts relevant to the contested issues in this lawsuit, that is, facts pertinent to the conduct and communications of the parties in 2011 and 2012, and facts tending to establish the Defendants' intent in inducing Plaintiff to agree to the reverse merger that made the LuxeYard pump and dump possible.

Additionally, and as stated previously, Mr. Dolcefino has compiled the documents and information sought by Defendants in his role as an investigative journalist.[2] Under Section 22.023 of the Texas Civil Practice & Remedies Code, Mr. Dolcefino has a journalistic privilege to refuse to testify regarding, produce, or disclose "any confidential or nonconfidential information, document, or item obtained or prepared while acting as a journalist," as well as refusing to identify the source of any such information, document or item. Fundamentally, Jinsun's attempt to depose Mr. Dolcefino and subpoena documents from him is a complete waste of time, as Mr. Dolcefino is entitled to and will assert his journalistic privilege in response to each and every question and request.

In light of the foregoing, a protective order is necessary to prevent the completely unnecessary expense and utter waste of time associated with preparing for and attending the contemplated deposition of Mr. Dolcefino. Mr. Dolcefino has established his status as a journalist and his intent to assert his journalist's privilege, refusing to testify or produce any documents in response to Jinsun's request. Ex. B. Requiring Plaintiff, and for that matter Mr. Dolcefino and every other party to this lawsuit, to engage in this exercise in futility serves no purpose other than to squander the time and resources of all

---

[2] For purposes of the privilege, a journalist is broadly defined as "a person … who for a substantial portion of the person's livelihood or for substantial financial gain, gathers, compiles, prepares, collects, photographs, records, writes, edits, reports, investigates, processes, or publishes news or information that is disseminated by a news medium or communication service provider." Tex. Civ. Prac. & Rem. Code § 22.021(2). "News medium" is likewise broadly defined to include any entity "that disseminates news or information to the public by any means," including print, television, radio, photographic, mechanical, electronic, and other means known or unknown that are accessible to the public. *Id*. § 22.021(3).

involved.  Accordingly, Plaintiff respectfully requested that the Court sign a protective order to preempt this wasteful exercise.

**PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiff Khaled Alattar respectfully requests that this Court quash the deposition of Wayne Dolcefino, issue a protective order against future attempts to depose Mr. Dolcefino, and such other and further relief as to which Plaintiff may be justly entitled.

Respectfully submitted,

**KELLER & ASSOCIATES, P.C.**

By: _/s/ Brian M. Keller_

Brian M. Keller
State Bar No. 00784376
2500 West Loop South, Suite 300
Houston, TX 77027
281-853-9456
713-600-5804 (fax)
bkeller@kellerattorneys.com

Of Counsel:
Mark Ritchie
State Bar No. 24002845
mritchie@kellerattorneys.com

*Attorneys for Plaintiff Khaled Alattar*

4

## CERTIFICATE OF CONFERENCE

I certify that on June 19, 2015, I attempted to confer via email with Jason Hopkins, counsel for Jinsun LLC, regarding this motion to quash and motion for protective order, indicating that if I did not hear from him by 4:00 p.m. I would presume his opposition. Mr. Hopkins did not respond before the 4:00 p.m. deadline.

/s/ Mark Ritchie
Mark Ritchie

## CERTIFICATE OF SERVICE

A copy of this document was served electronically on all counsel of record on June 19, 2015, as follows:

David R. Clouston
Leslye Moseley
Sessions Fishman Nathan & Israel LLC
900 Jackson Street, Suite 440
Dallas, Texas 75202
(214) 741-3024 – office
(214) 741-3055 – facsimile
dclouston@sessions-law.biz
lmoseley@sessions-law.biz
*Attorneys for Jonathan Friedlander, Equity Highrise, Inc., Scott Gann,
Lazy Bear LLC, Lee Bear LLC, Sun Bear LLC, OSO Capital LLC and Joseph Lee*

Jason Hopkins
Jason Lewis
Adam S. Tyler
Greenberg Traurig, LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
(214) 665-3660 - office
(214) 665-5960 - facsimile
hopkinsjm@gtlaw.com
lewisjs@gtlaw.com
tylera@gtlaw.com
*Attorneys for Kevan Casey, Jinsun LLC and Far East Strategies LLC*

Mark S. Hellinger
The Hellinger Law Firm
12 Greenway Plaza, Suite 1100
Houston, Texas 77046
(713) 623-1153 – office
(713) 623-1221 – facsimile
mhellinger@hellingerlawfirm.com
*Attorney for Jonathan Camarillo and The Jonathan Camarillo Trust*

J. Randle Henderson
16506 FM 529, Suite 115-107
Houston, Texas 77095
(713) 870-8358 – office
(281) 758-0545 – facsimile
jrh@hendersonrandy.com
*Attorney for Sano Holdings, Inc., Kay Holdings, Inc., William W. Bartlett, Jr., Kevin Lisman, Thomas Hudson, The Brompton Group NA, LLC, Jeff Lamont, Robert Klinek, Susan Pack, Lance Baral, Lawrence Isen and the Isen Trust*

Charley Davidson
Anthony L. Laporte
Hanszen Laporte, LLP
11767 Katy Freeway, Suite 850
Houston, Texas 77079
(713) 522-9444 – office
(713) 524-2580 – facsimile
cdavidson@hanszenlaporte.com
alaporte@hanszenlaporte.com
*Attorneys for Mark Trotter*

Jonathan D. Neerman
Brian H. Oates
Jackson Walker L.L.P.
901 Main Street, Suite 6000
Dallas, Texas 75202
(214) 661-6899 – facsimile
(214) 952-5822 - facsimile
jneerman@jw.com
boates@jw.com
*Attorneys for Apex Clearing Corporation*

Arthur Gollwitzer, III
Michael Best & Friedrich LLP
12600 Hill Country Blvd., R-275
Austin, Texas  78738
(512) 329-2676 – office
(312) 222-0818 – facsimile
agollwitzer@michaelbest.com
*Attorney for Wilson-Davis & Co.*

Blaire Bruns Johnson
James Chambers
Edison, McDowell & Hetherington LLP
3200 Southwest Freeway, Suite 2100
Houston, Texas 77027
(713) 337-5580 – office
(713) 337-8850 – facsimile
blaire.johnson@emhllp.com
james.chambers@emhllp.com
*Attorneys for Acadia Holding Corporation*

Kevin T. Kennedy
2500 West Loop South, Suite 315
Houston, Texas 77027
(713) 979-2003 – facsimile
k.t.p.kennedy@gmail.com
*Attorney for Intervenors*

Tommy Allen
631 Cypresswood Ln.
Spring, Texas 77373
tallen2112@yahoo.com
*Defendant, Pro se*

/s/ *Brian M. Keller*

Brian M. Keller

## CAUSE NO. 2012-54501

| | | |
|---|---|---|
| KHALED ALATTAR, | § | IN THE DISTRICT COURT |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | |
| | § | 113th JUDICIAL DISTRICT |
| JINSUN, LLC, | § | |
| FAR EAST STRATEGIES, LLC, and | § | |
| KEVAN CASEY, et al., | § | |
| | § | |
| **Defendants.** | § | HARRIS COUNTY, TEXAS |

### JINSUN LLC'S FIRST AMENDED NOTICE OF DEPOSITION SUBPOENA DUCES TECUM OF WAYNE DOLCEFINO

**TO:** **Wayne Dolcefino, 3701 Kirby, Suite 560, Houston, Texas 77098.**

Pursuant to Rule 205.2 of the Texas Rules of Civil Procedure, please take notice that Defendant Jinsun LLC ("Jinsun") will take the oral deposition of Wayne Dolcefino before a certified court reporter on **June 26, 2015**, beginning at 10:00 a.m., and continuing thereafter until complete. The deposition will take place at the law offices of Greenberg Traurig LLP, 1000 Louisiana Street, Suite 1700, Houston, Texas 77002, or such other place as may be mutually agreed.

All parties are invited to attend and examine the witness as prescribed by the Texas Rules of Civil Procedure. The deposition will be recorded stenographically and may be videotaped. Any party wishing to have this deposition recorded by another method may serve written notice designating the desired method on all other parties and must make arrangements for the additional method at its own expense.

Pursuant to Rule 199.2(b)(5) of the Texas Rules of Civil Procedure, you are directed to produce, at or before the time of the deposition, the documents described in Exhibit "A" hereto.

Dated: June 16, 2015.

Respectfully submitted,

/s/ Jason M. Hopkins
Mary-Olga Lovett
  Texas Bar No. 00789289
  lovettm@gtlaw.com
Jason S. Lewis
  Texas Bar No. 24007551
  lewisjs@gtlaw.com
Jason M. Hopkins
  Texas Bar No. 24059969
  hopkinsjm@gtlaw.com
**GREENBERG TRAURIG, LLP**
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
(214) 665-3660 - office
(214) 665-5960 - facsimile

**ATTORNEYS FOR KEVAN CASEY, JINSUN, LLC, AND FAR EAST STRATEGIES, LLC**

## CERTIFICATE OF SERVICE

I certify that I served the foregoing notice on all counsel of record via email on June 16, 2015.

/s/ Jason M. Hopkins
Jason M. Hopkins

# Exhibit "A"

## INSTRUCTIONS

1. Singular and masculine forms of any nouns or pronouns shall embrace and be applied as the plural, feminine, or neuter, as the context requires, and vice versa.

2. The past tense of any verb shall embrace and be applied as the present tense, as the context requires or as applicable, and vice versa.

3. The plural includes the singular and vice versa.

4. Each request is to be construed and answered or responded to separately and independently, and is not to be referenced to any other request for purposes of limitation.

5. These requests are continuing in nature and require supplementation as soon as practical if you or your attorney obtain information which reveals that your answers were incorrect or incomplete when made or that your answers are no longer correct or complete.

6. Documents produced pursuant to these requests should be tendered either in the precise form or manner as they are kept in the usual course of business, or organized and labeled to correspond with the categories that follow in this request.

7. If any document has been destroyed, describe in detail the circumstances of and reasons for such destruction and produce all documents that relate to either the circumstances of or reasons for such destruction.

8. You are to produce all documents, as defined below, that are in your actual or constructive possession, custody, or control or in the possession, custody, or control of your respective counsel, agents, or representatives, or which can be obtained through reasonably diligent efforts. Without limiting the term "control," a document is deemed to be within one's control if you have ownership, possession or custody of the document, or the rights to secure the document or copy thereof from any person or public or private entity having physical possession thereof. The terms "possession, custody, or control" are to be construed in the broadest manner consistent with Texas law.

9. All duplicates or copies of documents are to be provided to the extent they have handwriting, additions, or deletions of any kind different from the original document being produced, and vice versa.

10. The requests and interrogatories herein seek documents and information from January 1, 2012 to present, unless otherwise stated.

## DEFINITIONS

The following terms have the following meanings, unless other required by context:

1. The terms "and" as well as "or" shall be construed either disjunctively or conjunctively to bring within the scope of these Requests any information which might otherwise be construed to be outside their scope.

2. "You" or "your" or "Dolcefino" means Wayne Dolcefino, and includes any person or entity (including Dolcefino Consulting) acting for or on behalf of Dolcefino, including, but not limited to all present and former directors, officers, agents, managers, servants, employees (including direct, borrowed, special or statutory employees), and/or representatives, affiliates, successors, predecessors, subsidiaries, parents, divisions, partners, attorneys, or other persons or entities acting or purporting to act on his behalf, whether individually or collectively.

3. "Luxeyard" means Luxeyard Inc., LY Retail LLC, and any person or entity acting on their behalf, including, but not limited to all present and former directors, officers, agents, managers, servants, employees (including direct, borrowed, special or statutory employees), and/or representatives, affiliates, successors, predecessors, subsidiaries, parents, divisions, partners, attorneys, or other persons or entities acting or purporting to act on Luxeyard's behalf, whether individually or collectively.

4. The term "Document" is used in the broadest sense and shall mean all things described in Rule 192.3(b) of the TEXAS RULES OF CIVIL PROCEDURE and includes, but is not limited to, any and all papers, files, reports, correspondence, summaries, stenographic or handwritten notes, announcements, drafts, and preliminary copies of documents, transcripts, minutes, studies, memoranda, notes or memoranda of conversations, telephone messages, transmittal slips, printed literature, brochures, catalogues, advertising of all types, test reports, articles, publications, books, pamphlets, pictures, diaries, appointment books, calendars, minute books, by-laws, stock certificates, statistical compilations, telegrams, telexes, cables, teletypes, mailgrams, facsimiles, graphs, charts, surveys, analyses, compilations, movie films, audiotapes, videotapes, microfilms, slides or still films, statistics, data processing cards, computer records, e-mails, computerized instant messages, .txt messages, SMS files, MMS files, computer tapes, printouts, books of account, ledgers, journals, spreadsheets, control sheets, working papers, audits, or any writing or documentation or data of any kind or description, whether handwritten, typewritten, printed, copied, microfilmed, printed on computer cards or tapes or data in existence or available or otherwise retrievable, in your custody, possession, or control of every type and description, regardless of form or nature, pertaining in whole or in part, directly or indirectly, to the matters referred to in the foregoing Requests. Please note that such definition includes electronic or videotape recordings, electronic data and data compilations. As it relates to information that is stored as electronic or magnetic data on a computer, or any other information storage devise, the terms "document," "documents," or "documentation" includes the raw electronic data and software applications necessary to translate the information into useable form as well as any tangible copies or printouts of such information.

5. The term "Communications" shall mean any oral or written utterance, transfer or exchange of information, notation or statement of any nature whatsoever, by or to whomever made, including, but not limited to correspondence, conversations, dialogues, discussions, interviews, consultations, telephone calls, meetings, telexes, cables, agreements, electronic mail,

text messages transmitted by cellular telephone, instant messaging, and/or any other understandings.

## REQUESTS FOR PRODUCTION

Please produce any document that contains, concerns, embodies, refers to, relates to, analyzes, summarizes, evaluates, discusses, reports, explains, supports, corroborates, substantiates, confirms, disputes, refutes, contradicts, forms a basis of or otherwise contains information about the following:

1. Communications with any party (or former party) to this lawsuit;

2. Communications with counsel for any party (or former party) to this lawsuit;

3. Communications with Amir Mireskandari, Alidad Mireskandari, or Yuval Ran;

4. Communications with any other person, entity, or government agency relating to Luxeyard, this lawsuit, or any defendant in this lawsuit;

5. Your retention or engagement by any party (or former party) to this lawsuit; counsel for any party (or former party) to this lawsuit; Amir Mireskandari, Alidad Mireskandari, or Yuval Ran;

6. Payments made, or due to be made, to you by any party (or former party) to this lawsuit, counsel for any party (or former party) to this lawsuit, Amir Mireskandari, Alidad Mireskandari, or Yuval Ran;

7. Your review of documents involving litigation relating to Luxeyard;

8. Your research into financial transactions known or suspected to be "pump and dump" schemes;

9. Documents or other work product generated by you that relate to Luxeyard, this lawsuit, or any defendant in this lawsuit; and

10. Telephone records reflecting all calls you made relating to Luxeyard, this lawsuit, or any defendant in this lawsuit.

**CAUSE NO. 2012-54501**

| | | |
|---|---|---|
| **KHALED ALATTAR,** | § | **IN THE DISTRICT COURT** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **113ᵗʰ JUDICIAL DISTRICT** |
| **JINSUN, LLC,** | § | |
| **FAR EAST STRATEGIES, LLC, and** | § | |
| **KEVAN CASEY, et al.,** | § | |
| | § | |
| **Defendants.** | § | **HARRIS COUNTY, TEXAS** |

---

## FIRST AMENDED DEPOSITION SUBPOENA DUCES TECUM

---

**STATE OF TEXAS**

**COUNTY OF HARRIS**

TO ANY SHERIFF, CONSTABLE, OR OFFICER FOR THE STATE OF TEXAS OR ANY OTHER AUTHORIZED PERSON TO SERVE AND EXECUTE SUBPEONAS AS PROVIDED IN THE TEXAS RULES OF CIVIL PROCEDURE 176.

Greetings:

YOU ARE HEREBY COMMANDED TO SUBPOENA AND SUMMON THE FOLLOWING DEPONENT:

**Wayne Dolcefino**
**3701 Kirby, Suite 560**
**Houston, Texas 77098**

to appear before a certified court reporter for the State of Texas at the law offices of Greenberg Traurig LLP, 1000 Louisiana Street, Suite 1700, Houston, Texas 77002, or such other place as may be mutually agreed, on **June 26, 2015 at 10:00 a.m.**, to attend and give testimony and produce documents in the above case at a deposition taken on behalf of Defendant Jinsun LLC, and to remain in attendance from day to day until lawfully discharged. The deposition may also be videotaped.

**Contempt: Failure by any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena is issued or a**

**district court in the county in which the subpoena is served, and may be punishable by fine or confinement, or both. Tex. R. Civ. P. 176.8(a).**

WITNESS MY HAND this the 16th day of June, 2015.

Respectfully submitted,

/s/ Jason M. Hopkins
Mary-Olga Lovett
  Texas Bar No. 00789289
  lovettm@gtlaw.com
Jason S. Lewis
  Texas Bar No. 24007551
  lewisjs@gtlaw.com
Jason M. Hopkins
  Texas Bar No. 24059969
  hopkinsjm@gtlaw.com
**GREENBERG TRAURIG, LLP**
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
(214) 665-3660 - office
(214) 665-5960 - facsimile

**ATTORNEYS FOR KEVAN CASEY, JINSUN, LLC, AND FAR EAST STRATEGIES, LLC**

## CAUSE NO. 2012-54501

| | | |
|---|---|---|
| KHALED ALATTAR, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | 113th JUDICIAL DISTRICT |
| JINSUN, LLC, | § | |
| FAR EAST STRATEGIES, LLC, and | § | |
| KEVAN CASEY, et al., | § | |
| | § | |
| Defendants. | § | HARRIS COUNTY, TEXAS |

### PROOF OF SERVICE

Came to hand on ___June 16th, 2015___ .

Executed at: ___3701 Kirby (Suite #560), Houston, Texas/77098___

Within the county of _Harris_ at ___3:38 p.m.___ , on ___06/16/2015___
by delivering to the within named:

**Wayne Dolcefino**

In person a true copy hereof and tendering $11.00 in cash.

_Todd Garrett_

By: _Todd Garrett_
Server ID # _SCH 9117_    _Exp: 09/30/2017_

Subscribed and sworn to by _C. Todd Garrett_, Before me, the undersigned authority, on this
the ___17th___ day of June, 2015.

YAQUELIN G CUESTA
My Commission Expires
January 17, 2018

_Y G Cuesta_
Notary Public in and For the State of Texas

PROOF OF SERVICE OF SUBPOENA – PAGE 1
DAL 79492903v2

# AFFIDAVIT OF WAYNE DOLCEFINO

STATE OF TEXAS       §
                             §

COUNTY OF HARRIS     §

On this day, Wayne Dolcefino appeared before me, the undersigned notary public, and after I administered an oath to him, upon his oath, he said:

1. My name is Wayne Dolcefino. I am over the age of twenty-one (21) years, of sound mind, and competent to make this affidavit. The facts stated within this affidavit are within my personal knowledge and are true and correct.

2. For nearly 27 years, I headed up the 13 Undercover Unit at KTRK TV. As an investigative journalist, I specialized in reporting on public corruption, wasteful government spending, and fraud. Since leaving KTRK TV, I have continued to devote substantial amounts of my time as a consultant to investigating and preparing news and information to be distributed through written and broadcast news media.

3. Recently, I started developing a story on a group of individuals who have participated in a number of "pump and dump" schemes, including the one that targeted LuxeYard. All information I have regarding LuxeYard and the related "pump and dumps" was obtained by me to put together this story.

4. I have contacted some of the individuals who participated in the LuxeYard "pump and dump" to offer them an opportunity to comment. I believe that the deposition notice and subpoena served on me earlier this week is an effort to intimidate me into abandoning this story.

FURTHER AFFIANT SAITH NOT.

_____
Wayne Dolcefino

SUBSCRIBED AND SWORN TO BEFORE ME, on this the ⎽⎽19⎽⎽ day of

⎽⎽June⎽⎽⎽⎽⎽⎽, 2015, by Wayne Dolcefino.

VERONICA MOSQUEDA
Notary Public, State of Texas
My Commission Expires
April 29, 2019

_____
Notary Public in and for
The State of TEXAS
My commission expires: ⎽4-29-19⎽

**CAUSE NO. 2012-54501**

| KHALED ALATTAR, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| KEVAN CASEY, ET AL., | § | |
| | § | |
| Defendants. | § | 113th JUDICIAL DISTRICT |

### PROPOSED ORDER ON PLAINTIFF'S MOTION TO QUASH DEPOSITION OF WAYNE DOLCEFINO AND MOTION FOR PROTECTIVE ORDER

ON THIS DAY came to be heard Plaintiff's Motion to Quash Deposition of Wayne Dolcefino and Motion for Protective Order. After considering Plaintiff's Motions, any responses on file, and the arguments of counsel, the Court is of the opinion that Plaintiff's Motions are meritorious and are in all things GRANTED. It is therefore,

ORDERED, ADJUDGED, AND DECREED that Plaintiff's Motion to Quash the Deposition of Wayne Dolcefino and Motion for Protective Order is GRANTED. The Amended Notice of Deposition and Subpoena Duces Tecum is quashed. Additionally, a protective order is hereby issued prohibiting further attempts to take the deposition of Wayne Dolcefino or otherwise obtain discovery from him in this proceeding.

SIGNED this _____ day of _____, 2015.

_____

JUDGE PRESIDING

# TAB D

CAUSE NO. 2012-54501

| | | |
|---|---|---|
| **KHALED ALATTAR,** | § | **IN THE DISTRICT COURT** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **113th JUDICIAL DISTRICT** |
| **JINSUN, LLC,** | § | |
| **FAR EAST STRATEGIES, LLC, and** | § | |
| **KEVAN CASEY, et al.,** | § | |
| | § | |
| | § | |
| **Defendants.** | § | **HARRIS COUNTY, TEXAS** |

### JINSUN LLC'S RESPONSE TO MOTION
### TO QUASH DOLCEFINO DEPOSITION

Defendant Jinsun LLC ("Jinsun") files this Response to Plaintiff's Motion to Quash Deposition of Wayne Dolcefino and Motion for Protective Order and states:

### Introduction

Wayne Dolcefino, who runs a Houston-area consulting business, has repeatedly contacted defendants in this case and claimed that he has substantial information relating to "pump and dumps" of both Luxeyard and other companies into which Alattar has sought (and the Court has allowed) discovery. Jinsun properly subpoenaed Dolcefino's deposition so that it could obtain that information, but Plaintiff moved to quash the deposition on the basis that Dolcefino is exempt from discovery under the Texas reporter shield law. That argument is baseless because Dolcefino—who describes himself as a consultant hired by a law firm—is not a reporter to whom the shield law applies.

### Argument and Authorities

Dolcefino is not a journalist entitled to protections under the Texas reporter's shield law. That law, enacted in 2009, has as its stated purpose the preservation of "a free and active press."

Tex. Civ. Prac. & Rem. Code § 22.022. The problem for Dolcefino is that he is not a member of the press.

In the affidavit Dolcefino provided to Plaintiff's counsel, Dolcefino testifies that he was formerly employed as a reporter for KRTK TV.[1] But no provision of law creates any privilege for a former reporter. And a cursory examination of Dolcefino's own website demonstrates that he is no longer a newsman. On his website, Dolcefino states that he is president of an outfit called Dolcefino Consulting, which provides "credibility when you need it most."[2] Dolcefino advertises his services in "litigation support," as a testifying expert witness,[3] a political consultant,[4] and a private investigator who "knows how to dig ... and what to dig for."[5] Dolcefino summarizes the list of "services" he provides:

> This firm consults on crisis management, ethics reviews, informational marketing and media relations and provides production, investigative services and expert testimony in litigation. Dolcefino has significant experience in courtroom litigation relating to first amendment issues.[6]

Nowhere in the list of "Services" he provides is there a single mention of journalism.

Dolcefino's description of his work confirms that he deals in advocacy, not reporting. He writes on his website that "[t]he opposition must understand the power of your client's argument and what that will look like if your case goes to a jury. They must also understand the power of that suffering if their anguish ever appears on the internet, not for one night on local news, but for years to come."[7] Apparently, Dolcefino intends to help "the opposition" [*i.e.*, Jinsun] understand

---

[1] Plaintiff's Motion to Quash at Exhibit "B," ¶ 2.
[2] www.dolcefinoconsulting.com
[3] *Id.*
[4] www.dolcefinoconsulting.com/politicalconsulting
[5] www.dolcefinoconsulting.com/investigations
[6] www.dolcefinoconsulting.com/about
[7] www.dolcefinoconsulting.com/litigationsupport

Alattar's "suffering" by posting it on the internet. That is patently not journalism, much less journalism protected from the discovery process.

The fact that Dolcefino is not acting as a journalist is confirmed by statements he has made to parties to this case. Specifically, in January of 2015, Dolcefino called Kevan Casey and told Mr. Casey that he had been hired by an unnamed law firm to write a "pump and dump piece" on Mr. Casey.[8] Importantly, the "pump and dump piece" Dolcefino intended to write—but apparently hasn't gotten around to writing yet—would involve not only on Luxeyard, but also the other companies Alattar has repeatedly presented to the Court as "other pump and dumps."[9]

Separately, on June 5, 2015, Dolcefino sent a letter to Mr. Camarillo's lawyer, a true and correct copy of which is attached as Exhibit "B." In that letter, Dolcefino describes his firm as an "investigative communications firm," says that he is "intrigued" with Mr. Camarillo's service in the United States Marine Corps, and threatens to contact "the Pentagon media office in Washington in the coming days to test their awareness of these civil issues."[10] He suggests that all Mr. Camarillo need do to avoid this obvious harassment is to set up an interview, and to assure "the plaintiffs"—a reference to Amir Mireskandari—that Mr. Camarillo is "OK with public discussion of this issue."[11] These efforts at harassment are wholly improper, especially when they are undertaken by a consultant employed by a lawyer, presumably a lawyer representing a party to this case.

Notably, actions of third parties acting under an attorney's direction, such as investigators, can be imputed to the law firm in the context of attorney ethics. *See* ABA

---

[8] Casey Affidavit, Exhibit "A," at ¶ 2.
[9] *Id*. at ¶ 3.
[10] Exhibit "B" at 1.
[11] *Id*. at 1-2.

Committee on Ethics and Professional Responsibility, Formal Op. 95-396 (investigator acting as lawyer's alter ego; lawyer ethically responsible for investigator's conduct). Certainly, if Dolcefino is directly contacting parties to this case as an undisclosed representative of a law firm involved in this case, then he and the firm he is allegedly working for are violating Texas Disciplinary Rule of Professional Conduct 4.02, which provides that "a lawyer shall not communicate or cause or encourage another to communicate about the subject of the representation with a person, organization or entity of government the lawyer knows to be represented by another lawyer regarding that subject, unless the lawyer has the consent of the other lawyer or is authorized by law to do so."

Jinsun is entitled to take the deposition of any nonparty witness who has relevant information, and Dolcefino unquestionably falls within that category. The information he claims to possess relating to Luxeyard, as well as Alattar's "other pump and dumps" into which the Court has allowed discovery, is patently discoverable, *especially if* he obtained that information from the parties to this case or their counsel. His admitted communications with Amir Mireskandari are discoverable, as are his communications with lawyers and parties in this case. His intent in sending the extortion letter to Mr. Camarillo's counsel is also discoverable, as is the question of whether he was instructed to send that letter by his employer. In short, Dolcefino has discoverable information, and Jinsun is entitled to take his deposition to get it.

## Prayer

WHEREFORE, Jinsun respectfully requests that the Court deny Plaintiff's motion, order the deposition of Dolcefino, and grant Jinsun such other and further relief to which it may be entitled.

Respectfully submitted,

/s/ Jason M. Hopkins
Mary-Olga Lovett
   Texas Bar No. 00789289
   lovettm@gtlaw.com
Jason S. Lewis
   Texas Bar No. 24007551
   lewisjs@gtlaw.com
Jason M. Hopkins
   Texas Bar No. 24059969
   hopkinsjm@gtlaw.com
**GREENBERG TRAURIG, LLP**
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
(214) 665-3660 - office
(214) 665-5960 - facsimile

**ATTORNEYS FOR KEVAN CASEY, JINSUN, LLC, AND FAR EAST STRATEGIES, LLC**

## CERTIFICATE OF SERVICE

I certify that I served the foregoing response on all counsel of record via email on June 24, 2015.

/s/ Jason M. Hopkins
Jason M. Hopkins

CAUSE NO. 2012-54501

| | | |
|---|---|---|
| KHALED ALATTAR, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 113th JUDICIAL DISTRICT |
| | § | |
| KEVAN CASEY, et al., | § | |
| | § | |
| Defendants. | § | HARRIS COUNTY, TEXAS |

## AFFIDAVIT OF KEVAN CASEY

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME, the undersigned notary public, on this day personally appeared Kevan Casey, who is known to me, and, after being duly sworn, stated on his oath as follows:

1.     My name is Kevan Casey. I am over twenty-one years of age, of sound mind, and otherwise competent to make this affidavit. I have never been convicted of a crime involving moral turpitude.  I have personal knowledge of the facts stated in this affidavit, and all statements contained herein are true and correct.

2.     Wayne Dolcefino called me in January of 2015.  On that call, Dolcefino told me that he had been hired by a law firm to do a pump and dump story on me.  He would not tell me what law firm hired him.

3.     Dolcefino asked me to come to his office to discuss several other companies. The companies he listed are those set forth in the "other pump and dump" chart Alattar has repeatedly presented to the Court in this case. I declined Dolcefino's request.

**Affidavit of Kevan Casey – Page 1**

Further affiant sayeth not.

_____
Kevan Casey

SUBSCRIBED AND SWORN to before me this 2-4 day of June, 2015.

_____
NOTARY PUBLIC FOR TEXAS

M. TOUSSAINT
Notary Public, State of Texas
My Commission Expires
February 25, 2018

**Affidavit of Kevan Casey – Page 2**

June 5, 2015

Mark S. Hellinger
The Hellinger Law Firm
12 Greenway Plaza, Suite 1100
Houston, Texas 77046

Mr. Hollinger,

I have already left messages with your office, so this will serve as an additional attempt to establish communications with your firm and your client Jonathan Camarillo.

Dolcefino Consulting is an investigative communications firm in Houston. For several months I have been researching financial transactions known or suspected in the law enforcement community as "pump and dump" schemes. Of course, that definition is obviously in the eye of the beholder.

As part of my review I have been examining public records involving ongoing litigation surrounding the rise and fall of LuxeYard, and in my research your client's name has surfaced. I am especially intrigued that Mr. Camarillo appears to have been implicated in litigation in these significant financial transactions, while being employed as a recruiter for the U.S. Marine Corp.

I understand Mr. Camarillo is out of the country in Japan, which may have shielded him from discovery, but of course not media scrutiny. I was planning on contacting the Pentagon media office in Washington in the coming days to test their awareness of these civil issues and whether this assignment was related to litigation, but thought you might be helpful in convincing your client to discuss this case, as well as his knowledge of Kevan Casey, Frederick Hutttner, Scott Gann and others. I am most intrigued about his decision to remain a recruiter despite his obvious knowledge of complicated financial transactions.

I have also reached out to Amir Mireskandari, who has complained vociferously in court documents about the Luxeyard circumstances. Mr. Mireskandari has advised he cannot discuss Mr. Camarillo on camera with any media partners while the litigation is proceeding. I am providing him with a copy of this correspondence.

I have been routinely providing updates to Scott Zamost of CNN Investigations and Ira Rosen, a senior investigative producer of 60 Minutes regarding a number of companies that appear to have had wild fluctuations in stock prices.

Would appreciate a phone call to set up an interview, and perhaps even your assistance in assuring the plaintiffs that you are OK with public discussion of this issue, since so many Americans invested in these companies.

Wayne Dolcefino
Dolcefino

Respectfully,

*Wayne Dolcefino*

Wayne Dolcefino
Dolcefino Consulting

# TAB E

## CAUSE NO. 2012-54501

| | | |
|---|---|---|
| **KHALED ALATTAR,** | § | **IN THE DISTRICT COURT** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **113th JUDICIAL DISTRICT** |
| **JINSUN, LLC,** | § | |
| **FAR EAST STRATEGIES, LLC, and** | § | |
| **KEVAN CASEY, et al.,** | § | |
| | § | |
| **Defendants.** | § | **HARRIS COUNTY, TEXAS** |

### JINSUN LLC'S SUPPLEMENT TO ITS RESPONSE TO MOTION
### TO QUASH DOLCEFINO DEPOSITION

Defendant Jinsun LLC ("Jinsun") files this Supplement to its Response to Plaintiff's Motion to Quash Deposition of Wayne Dolcefino and Motion for Protective Order and states:

1.      On May 16, 2013, KPRC-TV aired an interview with Dolcefino. That interview is available at http://www.click2houston.com/news/former-ktrk-reporter-wayne-dolcefino-talks-to-local-2/20179506.

2.      In the interview, Dolcefino stated: "**I run a communications company now, I am not an investigative reporter.**" *Id*. (emphasis added).

3.      Dolcefino's admission is conclusive proof that he is not a reporter entitled to the protections of the Texas reporter's shield law. Alattar's motion to quash Dolcefino's deposition on that basis must be denied.

### Prayer

WHEREFORE, Jinsun respectfully requests that the Court deny Plaintiff's motion, order the deposition of Dolcefino, and grant Jinsun such other and further relief to which it may be entitled.

Respectfully submitted,

/s/ Jason M. Hopkins
Mary-Olga Lovett
  Texas Bar No. 00789289
  lovettm@gtlaw.com
Jason S. Lewis
  Texas Bar No. 24007551
  lewisjs@gtlaw.com
Jason M. Hopkins
  Texas Bar No. 24059969
  hopkinsjm@gtlaw.com
**GREENBERG TRAURIG, LLP**
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
(214) 665-3660 - office
(214) 665-5960 - facsimile

**ATTORNEYS FOR KEVAN CASEY, JINSUN, LLC, AND FAR EAST STRATEGIES, LLC**

## CERTIFICATE OF SERVICE

I certify that I served the foregoing supplement on all counsel of record via the Court's

e-filing system on June 27, 2015.

/s/ Jason M. Hopkins
Jason M. Hopkins

# TAB F

| | |
|---|---|
| **From:** | Westin, Jennifer (Secy-Dal-LT) |
| **To:** | "lmoseley@sessions-law.biz"; "jrh@hendersonrandy.com"; "danny@sheenalawfirm.com"; "jneerman@jw.com"; "jeff@karchmerlaw.com"; "mhellinger@hellingerlawfirm.com"; "steven@engelhardtlaw.com"; "alaporte@hanszenlaporte.com"; "agollwitzer@michaelbest.com"; "brian@fkblawfirm.com"; "k.t.p.kennedy@gmail.com" |
| **Cc:** | Jason Hopkins |
| **Subject:** | Cause No. 2012-54501; Alattar |
| **Date:** | Tuesday, June 16, 2015 3:49:45 PM |
| **Attachments:** | 2015.06.16 [Alattar] First Amended Depo Subpoena - Dolcefino.pdf |

See attached.

Jennifer Westin
Secretary
Greenberg Traurig, LLP | 2200 Ross Avenue, Suite 5200 | Dallas, TX 75201
Tel 214.665.3656 | Fax 214.665.3601
westinj@gtlaw.com | www.gtlaw.com

 GreenbergTraurig

| KHALED ALATTAR, | § | IN THE DISTRICT COURT |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | |
| | § | 113th JUDICIAL DISTRICT |
| JINSUN, LLC, | § | |
| FAR EAST STRATEGIES, LLC, and | § | |
| KEVAN CASEY, et al., | § | |
| | § | |
| **Defendants.** | § | HARRIS COUNTY, TEXAS |

### JINSUN LLC'S FIRST AMENDED NOTICE OF DEPOSITION SUBPOENA DUCES TECUM OF WAYNE DOLCEFINO

**TO:    Wayne Dolcefino, 3701 Kirby, Suite 560, Houston, Texas 77098.**

Pursuant to Rule 205.2 of the Texas Rules of Civil Procedure, please take notice that Defendant Jinsun LLC ("Jinsun") will take the oral deposition of Wayne Dolcefino before a certified court reporter on **June 26, 2015**, beginning at 10:00 a.m., and continuing thereafter until complete.  The deposition will take place at the law offices of Greenberg Traurig LLP, 1000 Louisiana Street, Suite 1700, Houston, Texas 77002, or such other place as may be mutually agreed.

All parties are invited to attend and examine the witness as prescribed by the Texas Rules of Civil Procedure.  The deposition will be recorded stenographically and may be videotaped. Any party wishing to have this deposition recorded by another method may serve written notice designating the desired method on all other parties and must make arrangements for the additional method at its own expense.

Pursuant to Rule 199.2(b)(5) of the Texas Rules of Civil Procedure, you are directed to produce, at or before the time of the deposition, the documents described in Exhibit "A" hereto.

Dated: June 16, 2015.

Respectfully submitted,

/s/ Jason M. Hopkins
Mary-Olga Lovett
  Texas Bar No. 00789289
  lovettm@gtlaw.com
Jason S. Lewis
  Texas Bar No. 24007551
  lewisjs@gtlaw.com
Jason M. Hopkins
  Texas Bar No. 24059969
  hopkinsjm@gtlaw.com
**GREENBERG TRAURIG, LLP**
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
(214) 665-3660 - office
(214) 665-5960 - facsimile

**ATTORNEYS FOR KEVAN CASEY, JINSUN, LLC, AND FAR EAST STRATEGIES, LLC**

## CERTIFICATE OF SERVICE

I certify that I served the foregoing notice on all counsel of record via email on June 16, 2015.

/s/ Jason M. Hopkins
Jason M. Hopkins

## Exhibit "A"

### INSTRUCTIONS

1.      Singular and masculine forms of any nouns or pronouns shall embrace and be applied as the plural, feminine, or neuter, as the context requires, and vice versa.

2.      The past tense of any verb shall embrace and be applied as the present tense, as the context requires or as applicable, and vice versa.

3.      The plural includes the singular and vice versa.

4.      Each request is to be construed and answered or responded to separately and independently, and is not to be referenced to any other request for purposes of limitation.

5.      These requests are continuing in nature and require supplementation as soon as practical if you or your attorney obtain information which reveals that your answers were incorrect or incomplete when made or that your answers are no longer correct or complete.

6.      Documents produced pursuant to these requests should be tendered either in the precise form or manner as they are kept in the usual course of business, or organized and labeled to correspond with the categories that follow in this request.

7.      If any document has been destroyed, describe in detail the circumstances of and reasons for such destruction and produce all documents that relate to either the circumstances of or reasons for such destruction.

8.      You are to produce all documents, as defined below, that are in your actual or constructive possession, custody, or control or in the possession, custody, or control of your respective counsel, agents, or representatives, or which can be obtained through reasonably diligent efforts.  Without limiting the term "control," a document is deemed to be within one's control if you have ownership, possession or custody of the document, or the rights to secure the document or copy thereof from any person or public or private entity having physical possession thereof.  The terms "possession, custody, or control" are to be construed in the broadest manner consistent with Texas law.

9.      All duplicates or copies of documents are to be provided to the extent they have handwriting, additions, or deletions of any kind different from the original document being produced, and vice versa.

10.     The requests and interrogatories herein seek documents and information from January 1, 2012 to present, unless otherwise stated.

### DEFINITIONS

The following terms have the following meanings, unless other required by context:

1.     The terms "and" as well as "or" shall be construed either disjunctively or conjunctively to bring within the scope of these Requests any information which might otherwise be construed to be outside their scope.

2.     "You" or "your" or "Dolcefino" means Wayne Dolcefino, and includes any person or entity (including Dolcefino Consulting) acting for or on behalf of Dolcefino, including, but not limited to all present and former directors, officers, agents, managers, servants, employees (including direct, borrowed, special or statutory employees), and/or representatives, affiliates, successors, predecessors, subsidiaries, parents, divisions, partners, attorneys, or other persons or entities acting or purporting to act on his behalf, whether individually or collectively.

3.     "Luxeyard" means Luxeyard Inc., LY Retail LLC, and any person or entity acting on their behalf, including, but not limited to all present and former directors, officers, agents, managers, servants, employees (including direct, borrowed, special or statutory employees), and/or representatives, affiliates, successors, predecessors, subsidiaries, parents, divisions, partners, attorneys, or other persons or entities acting or purporting to act on Luxeyard's behalf, whether individually or collectively.

4.     The term "Document" is used in the broadest sense and shall mean all things described in Rule 192.3(b) of the TEXAS RULES OF CIVIL PROCEDURE and includes, but is not limited to, any and all papers, files, reports, correspondence, summaries, stenographic or handwritten notes, announcements, drafts, and preliminary copies of documents, transcripts, minutes, studies, memoranda, notes or memoranda of conversations, telephone messages, transmittal slips, printed literature, brochures, catalogues, advertising of all types, test reports, articles, publications, books, pamphlets, pictures, diaries, appointment books, calendars, minute books, by-laws, stock certificates, statistical compilations, telegrams, telexes, cables, teletypes, mailgrams, facsimiles, graphs, charts, surveys, analyses, compilations, movie films, audiotapes, videotapes, microfilms, slides or still films, statistics, data processing cards, computer records, e-mails, computerized instant messages, .txt messages, SMS files, MMS files, computer tapes, printouts, books of account, ledgers, journals, spreadsheets, control sheets, working papers, audits, or any writing or documentation or data of any kind or description, whether handwritten, typewritten, printed, copied, microfilmed, printed on computer cards or tapes or data in existence or available or otherwise retrievable, in your custody, possession, or control of every type and description, regardless of form or nature, pertaining in whole or in part, directly or indirectly, to the matters referred to in the foregoing Requests.  Please note that such definition includes electronic or videotape recordings, electronic data and data compilations.  As it relates to information that is stored as electronic or magnetic data on a computer, or any other information storage devise, the terms "document," "documents," or "documentation" includes the raw electronic data and software applications necessary to translate the information into useable form as well as any tangible copies or printouts of such information.

5.     The term "Communications" shall mean any oral or written utterance, transfer or exchange of information, notation or statement of any nature whatsoever, by or to whomever made, including, but not limited to correspondence, conversations, dialogues, discussions, interviews, consultations, telephone calls, meetings, telexes, cables, agreements, electronic mail,

text messages transmitted by cellular telephone, instant messaging, and/or any other understandings.

### REQUESTS FOR PRODUCTION

Please produce any document that contains, concerns, embodies, refers to, relates to, analyzes, summarizes, evaluates, discusses, reports, explains, supports, corroborates, substantiates, confirms, disputes, refutes, contradicts, forms a basis of or otherwise contains information about the following:

1. Communications with any party (or former party) to this lawsuit;

2. Communications with counsel for any party (or former party) to this lawsuit;

3. Communications with Amir Mireskandari, Alidad Mireskandari, or Yuval Ran;

4. Communications with any other person, entity, or government agency relating to Luxeyard, this lawsuit, or any defendant in this lawsuit;

5. Your retention or engagement by any party (or former party) to this lawsuit; counsel for any party (or former party) to this lawsuit; Amir Mireskandari, Alidad Mireskandari, or Yuval Ran;

6. Payments made, or due to be made, to you by any party (or former party) to this lawsuit, counsel for any party (or former party) to this lawsuit, Amir Mireskandari, Alidad Mireskandari, or Yuval Ran;

7. Your review of documents involving litigation relating to Luxeyard;

8. Your research into financial transactions known or suspected to be "pump and dump" schemes;

9. Documents or other work product generated by you that relate to Luxeyard, this lawsuit, or any defendant in this lawsuit; and

10. Telephone records reflecting all calls you made relating to Luxeyard, this lawsuit, or any defendant in this lawsuit.

| KHALED ALATTAR, | § | IN THE DISTRICT COURT |
|---|---|---|
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | |
| | § | 113th JUDICIAL DISTRICT |
| JINSUN, LLC, | § | |
| FAR EAST STRATEGIES, LLC, and | § | |
| KEVAN CASEY, et al., | § | |
| | § | |
| **Defendants.** | § | HARRIS COUNTY, TEXAS |

---

## FIRST AMENDED DEPOSITION SUBPOENA DUCES TECUM

---

**STATE OF TEXAS**

**COUNTY OF HARRIS**

TO ANY SHERIFF, CONSTABLE, OR OFFICER FOR THE STATE OF TEXAS OR ANY OTHER AUTHORIZED PERSON TO SERVE AND EXECUTE SUBPEONAS AS PROVIDED IN THE TEXAS RULES OF CIVIL PROCEDURE 176.

Greetings:

YOU ARE HEREBY COMMANDED TO SUBPOENA AND SUMMON THE FOLLOWING DEPONENT:

**Wayne Dolcefino**
**3701 Kirby, Suite 560**
**Houston, Texas 77098**

to appear before a certified court reporter for the State of Texas at the law offices of Greenberg Traurig LLP, 1000 Louisiana Street, Suite 1700, Houston, Texas 77002, or such other place as may be mutually agreed, on **June 26, 2015 at 10:00 a.m.**, to attend and give testimony and produce documents in the above case at a deposition taken on behalf of Defendant Jinsun LLC, and to remain in attendance from day to day until lawfully discharged. The deposition may also be videotaped.

**Contempt: Failure by any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena is issued or a**

**district court in the county in which the subpoena is served, and may be punishable by fine or confinement, or both. Tex. R. Civ. P. 176.8(a).**

WITNESS MY HAND this the 16th day of June, 2015.

Respectfully submitted,

 /s/ Jason M. Hopkins
Mary-Olga Lovett
  Texas Bar No. 00789289
  lovettm@gtlaw.com
Jason S. Lewis
  Texas Bar No. 24007551
  lewisjs@gtlaw.com
Jason M. Hopkins
  Texas Bar No. 24059969
  hopkinsjm@gtlaw.com
**GREENBERG TRAURIG, LLP**
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
(214) 665-3660 - office
(214) 665-5960 - facsimile

**ATTORNEYS FOR KEVAN CASEY, JINSUN, LLC, AND FAR EAST STRATEGIES, LLC**

## CAUSE NO. 2012-54501

| | | |
|---|---|---|
| **KHALED ALATTAR,** | § | **IN THE DISTRICT COURT** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **113ᵗʰ JUDICIAL DISTRICT** |
| **JINSUN, LLC,** | § | |
| **FAR EAST STRATEGIES, LLC, and** | § | |
| **KEVAN CASEY, et al.,** | § | |
| | § | |
| **Defendants.** | § | **HARRIS COUNTY, TEXAS** |

## PROOF OF SERVICE

Came to hand on _____.

Executed at:_____.

Within the county of Dallas at _____, on _____.
by delivering to the within named:

### Wayne Dolcefino

In person a true copy hereof and tendering $11.00 in cash.

_____

By: _____
Server ID #

Subscribed and sworn to by _____, Before me, the undersigned authority, on this
the _____ day of June, 2015.

_____
Notary Public in and For the State of Texas

**PROOF OF SERVICE OF SUBPOENA – PAGE 1**
*DAL 79492903v2*

# TAB G

CAUSE NO. 201254501

Pgs-3

QUDEX
JNPAX
REPAX
MODIX

ALATTAR, KHALED,           §           IN THE DISTRICT COURT OF
                          §
        *Plaintiff(s),*    §
                          §
vs.                       §           HARRIS COUNTY, TEXAS
                          §
                          §
CASEY, KEVAN,             §           113th JUDICIAL DISTRICT
        *Defendant(s).*    §

ORDER

Pursuant to notice dated June 23, 2015, a conference was held by telephone on June 29, 2015 concerning a dispute among the parties concerning Plaintiff's Motion to Quash Deposition of Wayne Dolcefino and Motion for Protective Order, filed June 19, 2015. The Court considered the said Motion, the response thereto filed by Jinsun, LLP on June 24, 2015 and its supplement filed on June 29, 2015, as well as the argument of counsel and relevant authority. Inasmuch as no party asserts that Mr. Dolcefino has personal knowledge of any facts relevant to the disputed issues in this case; that it appears whatever relevant information Dolcefino may possess is available to the parties from other sources through discovery; and, that there is no compelling need for Dolcefino's research or conclusions, the Motion to Quash is granted.

On June 8, 2015, a hearing was held on Plaintiff's Amended Motion for Leave to Add Donald Cameron, Acadia Life Limited and Acadia Life International Limited as Defendants, filed June 3, 2015. Several counsel voiced opposition to the said Motion at the hearing, yet no written responses to the Motion were filed before the hearing, and none have been filed since, though time was allowed for same. The said Motion for leave to add Donald Cameron, Acadia Life Limited and Acadia Life International Limited as parties is granted. Plaintiff is permitted to file an amended pleading to add such parties after the June 22, 2015 pleading cut-off, provided any such amended pleading shall not amend any claims made against existing Defendants.

The Defendants' Motion to Realign the Parties is granted. Henceforth, the Plaintiffs in the case shall be Khaled Alattar, Babak Daghighi and Luxeyard, Inc.

Plaintiff's Motion to Compel the Deposition of Jonathan Friedlander, previously set for hearing on June 8, 2015, is rescheduled for hearing on July 24, 2015 at 1:30 PM.

In light of the June 8, 2015 Order withdrawing the jury assignment for the case, the Court's Pre-Trial Scheduling Order signed February 5, 2015 is amended only in the following respects:

The pre-trial hearing scheduled for October 15, 2015 is cancelled.

The requirement that the parties exchange certain pre-trial materials is amended to read as follows:

The parties are directed to exchange the following on or before September 30, 2015:

- Each party's estimate of the time needed for presentation of its case, in days or portions thereof;
- Each party's proposed findings of fact and conclusions of law;
- Trial Exhibit lists;
- Copies of demonstrative exhibits;
- Trial witness lists, which shall identify which witnesses, if any, will be presented via deposition;
- Excerpt designations for any testimony to be offered by deposition at trial; and,
- Proposed stipulations of facts.

Each party may file with the Court a pre-trial brief on or before September 30, 2015; all other materials may be brought to trial. Pre-trial briefs shall address issues of law only and shall not exceed 20 pages in length. Any rebuttal brief shall not exceed ten pages.

Certified Document Number: 66057311 - Page 2 of 3

Except as modified herein, the Pre-Trial Scheduling Order signed February 5, 2015 remains in effect.

June 30, 2015

_____
Hon. MICHAEL LANDRUM
Judge, 113th District Court



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   July 6, 2015

Certified Document Number:        66057311 Total Pages:  3

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**